# EXHIBIT 5 – Vol. 3

Dockets.Justia.com

**Internal Appeal (Cont.)**

The *covered person's doctor* should give the nurse reviewer any added information which: (a) relates to the case; and (b) may impact on the first decision. The nurse will send the request directly to MDR for review.

The case will then be reviewed by an MDR doctor. The MDR doctor may request that the *covered person* obtain a second opinion from a Board certified specialist who: (a) is on PHCS' list of specialists who are qualified, by reason of their specialty, to give an opinion on the proposed surgery; and (b) was not involved in the initial decision. The *covered person* must call PHCS to arrange for a second opinion. PHCS will give the *covered person* a list of *doctors* in his or her area who are Board certified in the specialty related to the surgery. He or she must go to one of these *doctors* for a second opinion. The *covered person* or his or her *doctor* may also request a second opinion at this time. Where a second surgical opinion has been requested, the initial denial will not be reversed unless it has been obtained from a specialist on PHCS' list.

PHCS gives second opinion forms to the *covered person*. The *doctor* he or she chooses fills them out and then returns them to Guardian, with a completed claim form. PHCS will notify the *covered person* and his or her *doctor* of the second opinion report. If the second opinion finds the proposed surgery is not medically necessary, we pay no benefits for the surgery and related charges. If the second opinion finds the proposed surgery to be medically necessary, we pay benefits for the surgery, subject to all the terms of this *plan*.

CGP-3-R3-APPL-PHCS                                                      B453.6753-R

We cover charges for the second surgical opinion, including charges for related X-rays and tests. But, what we pay is based on all the terms of this *plan*.

PHCS must make a decision within 60 days of receipt of all necessary information. It then has 2 business days to notify the *covered person*.

**Expedited Appeal**     If the *covered person's doctor* asks for an immediate appeal, he or she can submit added information by telephone or fax. PHCS must make a decision on this appeal within 2 business days of receipt of all necessary information. Written notice of a *final adverse determination* must be sent to the *covered person* within 24 hours of making the decision.

If the expedited appeal is not in favor of the *covered person*, he or she may appeal it through an internal appeal, described above. **But, since denial under the expedited appeal is a *final adverse determination*, if the *covered person* asks for an internal appeal, the time may expire for the *covered person* to request an external appeal from the State.**

If a decision on an internal appeal, including an expedited appeal, is not made within the stated time frames, the *adverse determination* in the initial review is reversed. We will pay for the services covered by this *plan*. But what we pay is based on all the terms of the *plan*. And, there is no need for an external appeal.

The *covered person* and the *covered person's doctor* will be sent the appeal decision in writing. This notice will detail the reasons for the decision. It will state that the notice is a *"final adverse determination"* and include instructions, materials and requirements for an external review.

**Right To An External Appeal**

As shown below, the *covered person* has a right to an external appeal of a denial of coverage. If we denied coverage on the basis that the service is not medically necessary or is an *experimental* or investigational treatment, the *covered person* or his or her representative may appeal that decision to an *External Appeal Agent.* An *"External Appeal Agent"* means an independent entity certified by the State to conduct such appeals.

**Right To Appeal A Determination That A Service Is Not Medically Necessary**

If coverage has been denied on the basis that the service is not medically necessary, the *covered person* may appeal to an *External Appeal Agent* if he or she satisfies both of the following:

- The service, procedure or treatment must be covered by this *plan;* and

- The *covered person* must have received a *final adverse determination* through this *plan's* internal appeal process, and Guardian must have upheld the denial; or the *covered person* and Guardian must agree in writing to waive any internal appeal.

**Right To Appeal A Determination That A Service Is Experimental Or Investigational**

If coverage has been denied on the basis that the service is *experimental* or investigational, he or she must satisfy both of the following:

- The service must be covered by this *plan;* and

- The *covered person* must have received a *final adverse determination* through this *plan's* internal appeal process, and Guardian must have upheld the denial; or the *covered person* and Guardian must agree in writing to waive any internal appeal.

And, the *covered person's* doctor must certify that he or she has a *life-threatening* or *disabling condition or disease.*

A *"life-threatening condition or disease"* means one which, according to the current diagnosis of the *covered person's doctor,* has a high probability of death.

A *"disabling condition or disease"* means any medically determinable physical or mental impairment that can be expected to result in death, or that has lasted or can be expected to last for a continuous period of not less than twelve months, which makes the *covered person* unable to engage in any substantial gainful activities. In the case of a *covered dependent* child under the age of eighteen, a *"disabling condition or disease"* is any medically determinable physical or mental impairment of comparable severity.

The *covered person's doctor* must also certify that the *life-threatening* or *disabling condition or disease* is: (a) one for which standard health services are ineffective or medically inappropriate; or (b) one for which there does not exist a more beneficial standard service or procedure covered by this *plan;* or (c) one for which there exists a clinical trial as defined by law.

Also, the *covered person's doctor* must have recommended:

- A service, procedure or treatment that two documents from medical and scientific evidence show is likely to be more beneficial to the *covered person* than any standard covered service. Only certain documents will be considered to support this. The *covered person's doctor* should contact the State to obtain current information as to what documents will be accepted; or

- A clinical trial for which the *covered person* is eligible. Only certain clinical trials can be considered.

For the purpose of this section, the *covered person's doctor* must be a licensed, board-certified or board eligible *doctor* qualified to practice in the area appropriate to treat his or her *life-threatening* or *disabling condition or disease.*

**The External Appeal Process**

If, through this *plan's* internal appeal process, the *covered person* received a *final adverse determination* that upholds a denial of coverage on the basis that the service is not medically necessary or is *experimental* or investigational treatment, he or she has 45 days from receipt of such notice to file a written request for an external appeal. If the *covered person* and Guardian have agreed in writing to waive any internal appeal, he or she has 45 days from receipt of such waiver to file a written request for an external appeal. An external appeal application will be provided with the *final adverse determination* or with the written waiver of an internal appeal.

The *covered person* may also request an external appeal application from New York State at 1-800-400-8882. He or she must complete the application and submit it to the State Department of Insurance at the address shown on the application. If the *covered person* meets the criteria for an external appeal, the State will forward the request to a certified *External Appeal Agent.*

The *covered person* will be able to submit added documentation with his or her request. If the *External Appeal Agent* decides that the information the *covered person* submits shows a material change from the information on which we based our denial, the *External Appeal Agent* will share this information with us so that we can exercise our right to reconsider our decision. If we choose to do so, we have three business days to amend or confirm our decision. Please note that in the case of an expedited appeal, described below, we do not have a right to reconsider our decision.

CGP-3-R3-APPL-PHCS-2                                                    B453.6755-R

In general, the *External Appeal Agent* must make a decision within 30 days of receipt of the *covered person's* completed application. The *External Appeal Agent* may request more information from the *covered person,* his or her *doctor* or us. If the *External Appeal Agent* requests more information, it will have five more business days to make its decision. The *External Appeal Agent* must notify the *covered person* in writing of its decision within two business days.

If the *covered person's doctor* certifies that a delay in providing a service that has been denied poses an imminent or serious threat to the *covered person's* health, the *covered person* may request an expedited external appeal. In that case, the *External Appeal Agent* must make a decision within three days of receipt of the *covered person's* completed application. Right after reaching a decision, the *External Appeal Agent* must try to notify the *covered person* and Guardian of that decision by telephone or fax. The *External Appeal Agent* must also notify the *covered person* of its decision in writing.

If the *External Appeal Agent* overturns the decision that a service is not medically necessary or approves coverage of an *experimental* or investigational treatment, we will provide coverage subject to all of the other terms and conditions of this *plan*. Please note that if the *External Appeal Agent* approves coverage of an *experimental* or investigational treatment that is part of a clinical trial, we will only cover the costs of services required to provide treatment to the *covered person* in accord with the design of the trial. And we do not pay for: (a) the cost of investigational drugs or devices; (b) the cost of non-health care services; (c) the cost of managing research; or (d) costs which would not be covered under this *plan* for non-experimental or non-investigational treatments provided in such clinical trial.

The *External Appeal Agent's* decision is binding on both the *covered person* and Guardian. The *External Appeal Agent's* decision is admissible in court.

We will charge the *covered person* a fee of $50.00 for an external appeal. The external appeal application instructs the *covered person* on how he or she must submit the fee. We will waive the fee if we determine that paying the fee would pose a hardship to the *covered person*. If the *External Appeal Agent* overturns the denial of coverage, the fee shall be refunded to the *covered person*.

**The Covered Person's Responsibilities**

**It is the *covered person's* RESPONSIBILITY to initiate the external appeal process.** The *covered person* may initiate the external appeal process by filing a completed application with the New York State Department of Insurance. If the requested service has already been provided to the *covered person,* his or her *doctor* may file an external appeal application on the *covered person's* behalf, but only if he or she has consented to this in writing.

**Under New York State law, the *covered person's* completed request for appeal must be filed within 45 days of either the date upon which the *covered person* receives written notification from us that we have upheld a denial of coverage, or the date on which he or she receives a written waiver of any internal appeal. Guardian has no authority to grant an extension of this deadline.**

**Covered Services/Exclusions**

In general, this *plan* does not cover *experimental* or investigational treatments. However, we will cover an *experimental* or investigational treatment approved by an *External Appeal Agent* in accordance with all of the other terms and conditions of this *plan*. If the *External Appeal Agent* approves coverage of an *experimental* or investigational treatment that is part of a clinical trial, we will only cover the costs of services required to provide treatment to the *covered person* according to the design of the trial. We shall not be responsible for: (a) the cost of investigational drugs or devices; (b) the cost of non-health care services; (c) the cost of managing research; or (d) costs which would not be covered under this *plan* for non-experimental or non-investigational treatments provided in such clinical trial.

CGP-3-R3-APPL-PHCS-3

B453.6757-R

**Benefit Provision**

B453.0785-R

**The Cash Deductible**

Each *benefit year*, each *covered person* must have *covered charges* that exceed the cash deductible before we pay any benefits to that person. The cash deductible is waived for the services of a *preferred provider*, and $200.00 for the services of a non-*preferred provider.* The cash deductible can't be met with *non- covered expenses.* Only *covered charges* incurred by the *covered person* while insured by this *plan* can be used to meet this deductible.

Once the cash deductible is met, we pay benefits for other *covered charges* above the deductible amount incurred by that *covered person,* less any applicable *co-insurance,* for the rest of that *benefit year.* But all charges must be incurred while that *covered person* is insured by this *plan.* And what we pay is based on all the terms of this *plan.*

CGP-3-R3-2.0-NYPPO

B453.4131-R

**Deductible Carryover Credit**

A *covered person* may have *covered charges* in the last three months of a *benefit year* which are used to meet the cash deductible under this *plan* for that year. These charges will also be used to meet the deductible for the next *benefit year.*

CGP-3-R3-3.0

B450.1177-R

**Group A And B Charges**

This *plan's covered charges* are identified below as Group A charges or Group B charges. There is no cash deductible or *co-payment* required for Group A charges.

- Group A Charges:

  Home Health Care Charges
  Extended Care Center Charges
  Hospice Care Charges
  Ambulatory Surgical Center Charges
  Pre-Admission Testing Charges
  Second Opinion Charges
  Birthing Center Charges
  The first $500.00 of Non Hospital Accident Charges

- Group B Charges:

  All Other Charges

CGP-3-R3-3.1

B453.0039-R

**Deductible Waiver**

The cash deductible is waived for surgery and anesthesia charges and charges for the services of a *preferred provider.*

CGP-3-R3-3.2

B453.0358-R

**Family Deductible Cap**

This *plan* has a family deductible cap of $500.00 for each *benefit year.* Amounts your *covered family* uses to meet its individual deductibles are applied to the family deductible cap. Once the cap is met, we pay benefits for other *covered charges* incurred by any member of your *covered family,* less any applicable *co-insurance,* for the rest of that *benefit year.* What we pay is based on all the terms of this *plan.*

CGP-3-R3-4.1-NYPPO

B453.2419-R

**Benefit Provision (Cont.)**

---

**Deductible For Common Accidents And Sicknesses**

Sometimes two or more *covered family* members are *injured* in the same accident. If they are, we apply only one cash deductible (each *benefit year*) against all *covered charges* due to that accident. We do the same if two or more *covered family* members get the same contagious disease within ten days of each other. What we pay is based on all of the terms of this *plan*.

Each *covered person* must still meet the balance of his or her own cash deductible before we pay benefits for charges due to other conditions.

CGP-3-R3-5.0                                                                    B450.1182-R

**Co-Payments**

*Co-payments* are the percentage of a covered charge that must be paid by a *covered person*. This plan's *co-payments,* shown below, do not include penalties incurred under this *plan's* utilization Review provisions, or any other non - *covered expense.*

The *co-payments* for this plan are as follows:

For most covered charges -

    For the services of a *preferred provider* . . . . . . . . . . . . No *co-payment*

    For the services of other providers

        Before the Non-*PPO co-payment* cap is met . . . . . . . . . . . . . . . 20%

        After the Non-*PPO co-payment* cap is met . . . . . . . . No *co-payment*

Note: There may be different payment rates for some types of charges. Read all provisions of this plan carefully.

CGP-3-R3-6.0                                                                    B453.6966-R

**Co-Payment Cap**

This *plan* caps *co-payment* amounts each *benefit year. Non-covered expenses* can't be used to meet the *co-payment* cap and a *covered person* still must pay all *non-covered expenses* even if this cap has been met.

There are *co-payment* caps for: (a) each *covered person;* and (b) each *covered family*. The *co-payment* cap for each *covered person* is $1,000.00. The *co-payment* cap for each *covered family* is $2,500.00.

Each *covered person's co-payment* amounts are used to meet his or her own *co-payment* cap, and are combined with *co-payment* amounts from other *covered family* members to meet the family's *co-payment* cap. But all amounts used to meet these caps must actually be paid by a *covered person* out of his or her own pocket.

Once a *covered person's co-payment* amounts in a *benefit year* exceed the individual cap, we waive his or her *co-payments* above this cap for the rest of that *benefit year*.

Once the covered family's *co-payment* amounts in a *benefit year* exceed the family cap, we waive their *co-payments* above this cap for the rest of that *benefit year*.

CGP-3-R3-CPC-93-3                                                              B453.3149-R

**Payment Limits**

For each *sickness* or *injury* we pay up to the payment limit shown below:

Charges for *in-patient* confinement in an *extended care* or *rehabilitation center,* per *benefit year* . . . . . . . . . . . . . . . . . . . 100 days

**Benefit  Provision  (Cont.)**

Charges for home health care, per *benefit year* . . . . . . . . . . . . . 100 visits

Charges for the treatment of infertility, in your lifetime  . . . . . . . $25,000.00

Charges for treatment of disease or deformity of the feet,
per *benefit year* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $2,500.00

Charges for manipulation, or adjustment of the spine,
per *benefit year* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 visits

All Other Charges

Lifetime payment limit for each *sickness*  or *injury*
not listed above  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . unlimited

CGP-3-R3-8.0                                                               B450.1187-R

**Daily  Room  And  Board  Limits**
● During a Period of *Hospital*  Confinement:

For semi-private room and board accommodations, we cover charges up to the *hospital's*  actual daily room and board charge.

For private room and board accommodations, we cover charges up to the *hospital's*  average daily semi-private room and board charge, or if the *hospital*  does not have semi-private accommodations, 90% of its lowest daily room and board charge.

For special care units, we cover charges up to the *hospital's*  actual daily room and board charge.

● For a Confinement In an *Extended Care Center* or *Rehabilitation Center:*

We cover the lesser of: (a) the center's actual daily room and board charge; or (b) 50% of the covered daily room and board charge made by the *hospital*  during the *covered person's*  preceding *hospital* confinement, for semi-private accommodations.

CGP-3-R3-9.0                                                               B453.0158-R

**Benefits  From  Other  Plans**
A *covered person*  may be covered by two or more plans that provide similar benefits. For instance, your spouse may be covered by this *plan*  and a similar plan through his or her own *employer*.  When another plan furnishes benefits which are similar to ours, we coordinate our benefits with the benefits from that other plan. We do this so that no one gets more in benefits than he or she incurs in charges. Read "Coordination of Benefits" to see how this works.

The benefits under this *plan*  may also be affected by *Medicare*.  See the provision "How This Plan Interacts With Medicare" for an explanation of how this works.

CGP-3-R3-10.1                                                              B450.1190-R

**Extended  Major  Medical  Benefits**

If a *covered person's*  insurance ends and he or she is totally disabled, under a *doctor's*  care, and not covered by another plan of group benefits, we extend major medical benefits for that person under this *plan*  as explained below. This is done at no cost to you.

**Extended Major Medical Benefits (Cont.)**

We only extend benefits for *covered charges* due to the disabling condition. The charges must be incurred before the extension ends. And what we pay is based on all the terms of this *plan.*

We don't pay for charges due to other conditions. And we don't pay for charges incurred by other *covered family* members.

The extension ends on the earliest of: (a) the date the total disability ends; or (b) one year from the date the person's insurance under this *plan* ends; or (c) the date the person becomes covered for benefits under another group plan. It also ends if the person has reached the payment limit for his or her disabling condition.

We don't grant an extension if the person's insurance ended because he or she failed to make required payments. And if a person receives benefits under this extension of benefits provision, he will not be eligible for coverage under any continuation of coverage provisions of this *plan* when the extension ends.

You are totally disabled if, due to *sickness* or *injury,* you can't perform the main duties of your occupation. A *covered dependent* is totally disabled if, due to *sickness* or *injury,* the *covered dependent* can't perform the normal activities of someone of the same age. You must submit evidence to us that you or your dependent is totally disabled, if we request it.

CGP-3-R3-11.0-NY                                                                B453.0602-R

## Covered Charges

This section lists the types of charges we cover. But what we pay is subject to all the terms of this *plan.* Read the entire *plan* to find out what we limit or exclude.

CGP-3-R3-12.0                                                                B450.1194-R

**Hospital Charges**   We cover charges for *hospital* room and board and *routine nursing care,* up to the daily room and board limit, when it is provided to you or a *covered dependent* by a *hospital* on an *inpatient* basis. And we cover other medically necessary *hospital* services and supplies provided to you or your *covered dependent* during the *inpatient* confinement.

If you or a *covered dependent* incur charges as an *inpatient* in a special care unit, we cover the charges, up to the daily room and board limit for special care units.

We also cover outpatient *hospital* services. These include emergency room treatment, and services provided by a *hospital* outpatient clinic.

Any charges in excess of the *hospital* daily room and board limit are a *non-covered expense.* This *plan's* utilization review features have penalties for non-compliance that may reduce what we pay for *hospital* charges.

We limit what we pay for the treatment of *mental and nervous conditions,* drug abuse and alcohol abuse. See the "Charges Covered with Special Limitations" section of this *plan.*

CGP-3-R3-13.0                                                                B450.1195-R

**Covered Charges (Cont.)**

| | |
|---|---|
| **Pre-Admission Testing Charges** | We cover pre-admission tests needed for a planned *hospital* admission or surgery. We cover these tests if: (a) the tests are done within seven days of the planned admission or surgery; and (b) the tests are accepted by the *hospital* in place of the same post-admission tests. |

We don't cover tests that are repeated after admission or before surgery, unless the admission or surgery is deferred solely due to a change in the *covered person's* health.

| | |
|---|---|
| **Extended Care And Rehabilitation Charges** | We cover charges, up to the daily room and board limit, for room and board and *routine nursing care* provided to you or a *covered dependent* on an *inpatient* basis in an *extended care center* or *rehabilitation center.* Charges above the daily room and board limit are a *non-covered expense.* |

And we cover all other medically necessary services and supplies provided to you or your *covered dependent* during the confinement. But the confinement must start within 14 days of a *hospital* stay. And we only cover the first 100 days of confinement in each *benefit year.* Charges for any additional days are a *non-covered expense.*

We also cover outpatient services furnished by an extended care or *rehabilitation center.*

But we limit what we pay for the treatment of *mental and nervous conditions,* drug abuse and alcohol abuse. See the "Charges Covered With Special Limitations" section of this *plan.*

CGP-3-R3-14.0                                                                 B450.1196-R

| | |
|---|---|
| **Home Health Care Charges** | When home health care can take the place of *inpatient* care, we cover such care furnished to you or a *covered dependent* under a written home health care plan. We cover medically necessary services or supplies, including prescribed drugs, which we would have covered if you or your *covered dependent* had been an *inpatient* in a recognized facility. But payment is subject to all of the terms of this *plan* and all of the conditions below: |

The *covered person's doctor* must certify that home health care is needed in place of *inpatient* care in a recognized facility.

The services and supplies must be: (a) ordered by the *covered person's* doctor; (b) included in the home health care plan; and (c) furnished by, or coordinated by, a home health care agency according to the written home health care plan. The services and supplies must be furnished by health care professionals with skills equivalent to the skilled professional care furnished in recognized facilities.

The home health care plan must be set up in writing by the *covered person's doctor* within 14 days after home health care starts. And it must be reviewed by the *covered person's doctor* at least once every 60 days.

We only cover the first 100 home health care visits each *benefit year.* Home health care charges after the first 100 visits in a *benefit year* are a *non-covered expense.*

Each visit by a home health aide, *nurse,* or other recognized provider whose services are authorized under the home health care plan can last up to four hours.

We don't pay for: (i) services furnished to family members, other than the patient; or (ii) services and supplies not included in the home health care plan.

CGP-3-R3-15.0                                                                                 B450.1197-R

**Doctor's Charges For Non-Surgical Care And Treatment**

We cover *doctor's* charges for the medically necessary non-surgical care and treatment of a *sickness* or *injury,* in excess of the *co-payment,* if any. But we limit what we pay for the treatment of mental and emotional conditions, drug abuse and alcohol abuse.

A *covered person* must pay a *co-payment* for each visit to a PPO *doctor's* office. The *co-payment* is a *non-covered expense.*

**Doctor's Charges For Surgery**

We cover *doctor's* charges for medically necessary surgery. We don't pay for cosmetic surgery. But we cover reconstructive surgery needed due to a *sickness* or *injury.* This surgery can be performed either at the same time as, or after, other needed surgery. We also cover reconstructive surgery needed due to a functional birth defect in a *covered dependent* child.

This *plan's* utilization review features have penalties for non-compliance that may reduce what we pay.

**Second Opinion Charges**

We cover *doctor's* charges for a second opinion and charges for related X-rays and tests when a *covered person* is advised to have surgery or enter a *hospital.* If the second opinion differs from the first, we cover charges for a third opinion. We cover such charges if the *doctors* who give the opinions: (a) are board certified and qualified, by reason of their specialty, to give an opinion on the proposed surgery or *hospital* admission; (b) are not business associates of the *doctor* who recommended the surgery; and (c) in the case of a second surgical opinion, they do not perform the surgery if it's needed.

**Ambulatory Surgical Center Charges**

We cover charges made by an *ambulatory surgical center* in connection with covered surgery.

CGP-3-R3-16.0                                                                                 B453.3167-R

**Hospice Care Charges**

We cover charges made by a *hospice* for *hospice* care furnished to a terminally ill *covered person.* But what we pay is subject to the terms set forth below, and to all of the terms of this *plan.*

"Hospice care" means care and treatment furnished by a *hospice* to a *covered person* who has been certified by his physician as having a life expectancy of six months or less.

*Hospice* care consists of services and supplies, including prescription drugs, provided by the *hospice* to the extent they are otherwise covered by this *plan.* Treatment may be furnished in a *hospice* or *hospital,* or on an outpatient basis in the terminally ill *covered person's* home under a home care plan, provided by a *hospice. Hospice* care includes up to five visits for bereavement counseling furnished to the terminally ill *covered person's* family.

We cover *hospice* care for up to 210 days, starting with the first day on which such care is provided. Bereavement counseling may be provided before or after the *covered person's* death.

But, the services and supplies must be: (1) needed for *hospice* care; (2) ordered by the *covered person's* physician; and (3) furnished by, or coordinated by a *hospice*.

And we don't pay for: (a) services and supplies provided by volunteers or others who do not regularly charge for their services; (b) funeral services and arrangements; (c) legal or financial counseling or services; or (d) services, except bereavement counseling, supplied to family members, other than the terminally ill *covered person*.

CGP-3-R3-17.0-NY                                                      B450.1309-R

**Preventive And Primary Care Services**

We pay benefits for *covered charges* for preventive and primary care services rendered to a *covered dependent* child up to age nineteen. This *plan's* deductible and *copayment* provisions do not apply to these benefits. But, what we pay is based on all of the other terms of this *plan* and on the following limitations.

"Preventive and Primary Care Services" mean:

- An initial *hospital* check-up and well-child visits scheduled in accord with the prevailing clinical standards of the American Academy of Pediatrics. These services must be done by, or under the supervision of, a *doctor* in a *hospital* or the *doctor's* office.

- Services at each visit in accord with the prevailing clinical standards of the American Academy of Pediatrics. These services include: a medical history; a complete physical exam; developmental assessment; anticipatory guidance; appropriate immunizations; and lab tests ordered at the time of the visit which are done in the *doctor's* office or in a clinical laboratory.

- Necessary immunizations against: diphtheria; pertussis; tetanus; polio; measles; rubella; mumps; haemophilus influenzae type b; and hepatitis b. These immunizations must meet the standards approved by the United States public health service.

Unless this *plan* provides specific benefits, we don't cover any other charges for routine, preventive, or diagnostic care.

CGP-3-R3-PPC-NY-94                                                   B453.3325-R

**Mammography Screening**

We pay benefits for *covered charges* for mammography screening provided to a *covered person*. We treat such charges the same way we treat any other *covered charges* for a *sickness*. But, what we pay is subject to all of the terms of this *plan* and to the following limitations.

We pay benefits only for: (a) a mammogram at any age, if recommended by a *doctor*, for a *covered person* with a history of breast cancer, or whose mother or sister has a history of the disease; (b) one baseline mammogram for a *covered person* age 35 through 39; (c) one mammogram every two years, or more frequently if recommended by a *doctor*, for a *covered person* age 40 through 49; and (d) one mammogram every year for a *covered person* age 50 or older.

But, unless this *plan* provides specific benefits, we don't cover any other charges for routine, preventive or diagnostic care.

CGP-3-R3-19.1-NY                                                     B453.1066-R

**Covered Charges (Cont.)**

**Pap Tests And Pelvic Exams**

We pay benefits for *covered charges* for Pap test and pelvic exam services furnished to a *covered person*. We treat such charges the same way we treat any other *covered charges* for *sickness*. But, what we pay is based on all of the terms of this *plan* and the following limitations.

We only pay benefits for such services for a *covered person* who is age 18 or older at the time the service is furnished. And, we only pay benefits for one Pap test and pelvic exam for each *covered person* each year.

A "Pap test" includes collecting and preparing a Pap smear and laboratory and diagnostic services to examine and evaluate the Pap smear.

But, unless this plan provides specific benefits, we don't cover any other charges for routine, preventive or diagnostic care.

CGP-3-R3-PAP-NY-92                                             B453.1748-R

**Other Covered Medical Services And Supplies**

We cover anesthetics and their administration; inhalation therapy; hemodialysis; radiation and chemotherapy; physical therapy by a licensed physical therapist; casts; splints; and surgical dressings.

We cover the initial fitting and purchase of braces, trusses, orthopedic footwear and crutches. But we don't pay for replacements or repairs.

We cover blood, blood products, and blood transfusions. But we don't pay for blood which has been donated or replaced on behalf of you or a *covered dependent*.

We cover medically necessary charges for transporting you or a *covered dependent* to: (a) a local *hospital* if needed care and treatment can be provided by a local *hospital*; or (b) the nearest *hospital* where medically necessary care and treatment can be given, if a local *hospital* can't provide this treatment. But it must be connected with an *inpatient* confinement. It can be by professional ambulance service, train or plane. But we don't pay for chartered air flights. And we won't pay for other travel or communication expenses of patients, *doctors, nurses* or family members.

We cover charges for the rental of *durable medical equipment* needed for therapeutic use. At our option, and with our advance written approval, we may cover the purchase of such items when it is less costly and more practical than rental. When we cover the purchase of such equipment, we also cover necessary maintenance and repairs. But we don't pay for: (1) any purchases without our advance written approval; or (2) the rental or purchase of items (such as air conditioners, exercise equipment, saunas and air humidifiers) which do not fully meet the definition of *durable medical equipment*.

CGP-3-R3-20.1-NY                                             B453.0433-R

We cover charges made by a *nurse* for medically necessary private duty nursing care. But we exclude 20% of the first two-thousand dollars in such charges incurred each *benefit year*. The charges we exclude are a *non-covered expense*.

CGP-3-R3-21.0                                             B450.1203-R

**Covered Charges (Cont.)**

We cover X-rays and laboratory tests which are medically necessary to treat a *sickness* or *injury.* But we don't pay for X-rays and tests done as part of routine physical checkups.

CGP-3-R3-22.0                                                                                       B450.1204-R

We cover drugs which require a *doctor's* prescription. But we only cover drugs which are approved for treatment of the *covered person's* sickness or *injury* by the Food and Drug Administration. In no event will we pay for drugs labeled: "Caution - Limited by Federal Law to Investigational Use." And we exclude drugs that can be bought without a prescription, even if a *doctor* orders them.

CGP-3-R3-23.0                                                                                       B450.1205-R

## Charges Covered With Special Limitations

**Recognized Providers**

*Covered charges* must be provided by recognized providers. The providers we recognize are listed in the glossary. We recognize both public and private facilities. But all providers must be properly licensed or certified under all applicable state and local laws to provide the services they render, and be operating within the scope of their license.

**Providers We Don't Recognize**

We don't recognize: (a) rest homes; (b) old age homes; (c) places that mainly provide *custodial care,* education or training; or (d) nurses' aides, home attendants, nutritionists, dieticians, or massage therapists unless this *plan* provides specific benefits for their services.

CGP-3-R3-24.0                                                                                       B450.1206-R

**Dental Care And Treatment**

We cover: (a) the diagnosis and treatment of oral tumors and cysts; and (b) the surgical removal of impacted teeth.

We also cover treatment of an *injury* to natural teeth or the jaw, but only if: (a) the *injury* occurs while the *covered person* is insured; (b) the *injury* was not caused, directly or indirectly by biting or chewing; and (c) all treatment is finished within twelve months of the date of the *injury.* Treatment includes replacing natural teeth lost due to such *injury.* But in no event do we cover orthodontic treatment.

**Prosthetic Devices**

We limit what we pay for prosthetic devices. We cover only the initial fitting and purchase of artificial limbs and eyes, and other prosthetic devices. And they must take the place of a natural part of a *covered person's* body, or be needed due to a functional birth defect in a *covered dependent* child. We don't pay for wigs, or dental prosthetics or devices. And we don't pay for replacements or repairs unless they are functionally necessary.

CGP-3-R3-25.1-NY                                                                                   B453.0018-R

**Pre-Existing Conditions**

A pre-existing condition is a *sickness* or *injury* for which during the six month period before a *covered person's enrollment date,* he or she: (a) receives medical advice, treatment or diagnosis; (b) takes prescribed drugs; or (c) receives a recommendation from a *doctor* to have medical treatment.

We don't pay benefits for a pre-existing condition until 12 months after the *covered person's enrollment date.*

**Charges  Covered  With  Special  Limitations  (Cont.)**

However, if a *covered person* was covered under *creditable coverage* prior to becoming covered by this *plan,* we'll subtract the time he or she was covered under aggregate periods of *creditable coverage* which are not separated by more than 62 days, from the length of time we exclude benefits for a pre-existing condition under this *plan.* But your *full-time* service with this *employer* must start within 62 days of the date your coverage under the previous plan ends. And the *covered person* must sign and complete an enrollment form or health statement, and submit any required documentation within 30 days of the date your *full-time* service with this *employer* starts.

A pregnancy which exists on a *covered person's enrollment date* under this *plan* is not a pre-existing condition. And we don't treat a *covered person's* genetic information as a pre-existing condition in the absence of a diagnosis of the condition related to such information.

This pre-existing conditions limitation does not affect benefits for unrelated conditions. And it doesn't apply to: (a) birth defects in a *covered dependent* child; or (b) newborns, newly adopted children under the age of 18, or children under the age of 18 newly placed for adoption, if such dependents are enrolled in this *plan* within 30 days of the date they become *eligible dependents.*

CGP-3-R-HIPAA-98                                                                B453.5186-R

**Treatment For Infertility**  We cover charges for the treatment of infertility, subject to all of the following conditions.

The couple experiencing the infertility must have a medically documented history of unexplained infertility lasting at least two years, or the infertility treatment must be certified by a *doctor* as medically necessary.

All treatment must be performed on an outpatient basis. We do not cover *inpatient* treatment for infertility.

The treatment must be performed in a facility which is licensed or certified for what it does by the state in which it operates.

We cover hormonal therapy, artificial insemination, sonograms or other treatment which meets the protocol set by the American College of Obstetricians and Gynecologists. But we only cover in-vitro fertilization, in-vivo fertilization, gamete intrafallopian transfer (GIFT), or similar procedures if the couple has not been able to obtain a successful pregnancy through other means.

We limit what we pay for treatment of infertility, per *covered family,* to $25,000.00 during your lifetime. Charges for treatment in excess of this limit, are a *non-covered expense* under this *plan.*

Unless this *plan* provides specific benefits, we don't pay for the resulting pregnancy.

CGP-3-R3-29.0                                                                  B450.1211-R

**Pregnancy**  This *plan* covers charges due to a *covered person's* pregnancy the same way we cover charges due to *sickness.* Except as stated below, the charges we cover for a newborn child are explained in the next section.

## Charges Covered With Special Limitations (Cont.)

When we pay benefits for pregnancy, we make at least two separate payments at reasonable intervals, for *covered charges* incurred by a *covered person* for pre-natal care. And, we make another payment for *covered charges* incurred by a *covered person* for delivery and postnatal care.

We also cover *birthing center* charges made for pre-natal care, delivery, and post partum care due to a *covered person's* pregnancy. We cover such charges up to the daily room and board limit for room and board and *routine nursing care* when *inpatient care* is provided by a *birthing center*. Charges in excess of the daily room and board limit are a non-covered expense. We cover all other medically necessary services and supplies during the confinement.

We cover a minimum of 48 hours of *inpatient care* for a mother and her newborn child following a normal vaginal delivery and a minimum of 96 hours of *inpatient* care for a mother and her newborn child following a cesarean section. We cover charges for such *inpatient* care the same way we cover charges for any other *inpatient* care in the facility in which the *covered person* is confined.

Minimum stay requirements will not apply in those instances where a decision to discharge the mother and her newborn child was made by the attending *doctor* in consultation with the mother. When delivery occurs in a *hospital* or *birthing center*, minimum stay requirements will begin at the time of birth; or, in the case of multiple births, at the time of the last delivery. If delivery occurs outside of a *hospital* or *birthing center*, minimum stay requirements will begin at the time the mother or newborn child is admitted to the *hospital* or *birthing center*. We will cover *inpatient* care in excess of minimum stay requirements if this is determined to be medically necessary by the attending *doctor*.

If the mother and her newborn child are discharged prior to minimum stay requirements, we will provide coverage for one home care visit. The visit must take place within 24 hours after discharge or of the time of the mother's request, whichever is later. Coverage will also include: (a) parent education; (b) assistance and training in breast or bottle feeding; and (c) the performance of any necessary maternal and newborn clinical assessments. But this *plan's* deductibles, copayments, and *encounter fees* will not apply to *covered charges* for the home care visit.

Except as shown, what we pay is based on all the terms of this *plan*.

CGP-3-R-PREG-01-NY                                                    B453.6953-R

**Benefits For A Covered Newborn Child**

Subject to all of the terms of this *plan*, we cover the care and treatment of your covered newborn child if he or she is sick, injured, premature, or born with a congenital birth defect.

And we cover charges for your child's routine nursery care while he or she is in the *hospital*. This includes: (a) nursery charges; (b) charges for routine *doctor's* examinations and tests; and (c) charges for routine procedures, like circumcision. But, unless this *plan* provides specific benefits, we don't pay for the routine care of the child once he or she leaves the *hospital*.

CGP-3-R3-32.0                                                        B450.1215-R

**Charges Covered With Special Limitations (Cont.)**

**Speech Therapy**

We cover speech therapy when needed due to a *sickness* or *injury.* But we exclude speech therapy services that are educational in any part, or due to: articulation disorders; tongue thrust; stuttering; lisping; abnormal speech development; changing an accent; dyslexia; hearing loss which is not medically documented; or similar disorders.

CGP-3-R3-33.0                                                                                    B450.1217-R

**Treatment For Spinal Manipulation**

We limit what we cover for *spinal manipulation* to 30 visits per *benefit year.* And we cover no more than two modalities per visit. Charges for such treatment above these limits are a *non-covered expense.*

CGP-3-R3-34.0                                                                                    B450.1218-R

**Diseases Or Deformity Of The Feet**

We pay benefits for *covered charges* for treatment of *sickness* or deformity below the ankle, but what we pay for such treatment is subject to a *benefit year* payment limit of $2,500.00 per *covered person* (not per foot). This limitation does not apply to dislocations or fractures of the feet.

CGP-3-R3-35.0                                                                                    B450.1219-R

**Treatment For Obesity**

We limit what we pay for the treatment of obesity. If a *covered person* is morbidly obese, we cover visits to a *doctor's* office, and related laboratory tests for the treatment of the morbid obesity. But we only cover one course of treatment. "Morbidly obese" means the *covered person* weighs at least twice as much as a normal person of the same height, age and sex. Treatment must be provided by a *doctor* on an outpatient basis according to a written treatment plan.

We don't pay for anything not included in the written treatment plan. And we don't pay for appetite or weight control drugs, dietary supplements, special foods or food supplements, health or weight control centers or resorts, health club memberships or exercise equipment.

A course of treatment begins and ends as specified in the treatment plan, or sooner if the *covered person* discontinues treatment.

We exclude more than one course of treatment or repeated attempts to lose weight. And we exclude all treatment of obesity for any *covered person* who is not morbidly obese.

CGP-3-R3-36.0                                                                                    B450.1220-R

**Diabetes**

We cover charges for the following services and supplies incurred by a *covered person* for the care and treatment of diabetes.

**Charges Covered With Special Limitations (Cont.)**

We cover charges for supplies and equipment used in the treatment of diabetes. Such supplies include: lancets and automatic lancing devices; glucose test strips; blood glucose monitors; blood glucose monitors for the visually impaired; control solutions used in blood glucose monitors; diabetes data management systems for management of blood glucose; urine testing products for glucose and ketones; oral anti-diabetic agents used to reduce blood sugar levels; alcohol swabs; syringes; injection aids including insulin drawing up devices for the visually impaired; cartridges for the visually impaired; disposable insulin cartridges and pen cartridges; all insulin preparations; insulin pumps and equipment for the use of the pump including batteries; insulin infusion devices; oral agents for treating hypoglycemia such as glucose tablets and gels; and glucagon for injection to increase blood glucose concentration. What we pay is based on all of the terms of this *plan*.

We also cover charges for diabetes self-management education programs.

Such coverage shall be limited to visits medically necessary upon the diagnosis of diabetes, where a doctor diagnoses a significant change in the *covered person's* symptoms or conditions which necessitates changes in such *covered person's* self management, or where reeducation or refresher education is necessary. Coverage shall also include home visits when medically necessary.

Education may be provided by a *doctor* or other licensed health care provider, or his or her staff, as part of an office visit for diabetes diagnosis or treatment, or by a certified diabetes nurse educator, certified nutritionist, certified dietitian or registered dietitian, upon the referral of a *doctor* or other licensed health care provider.

"Diabetes self-management education program" means a program which serves to ensure that a person with diabetes is educated as to the proper self-management and treatment of his or her condition, including information on proper diet.

CGP-3-R3-MM-NY-95                                                    B453.4372-R

**Enteral Formulas and Modified Solid Food Products**

We cover charges for enteral formulas and modified solid food products if the following criteria set forth below are met.

A *doctor* or other licensed health care provider has given a written order.

The written order shall state that the enteral formula is effective as a disease-specific treatment regimen for those individuals who are or will become malnourished or suffer from disorders, which if left untreated, cause chronic physical disability, mental retardation or death.

Modified solid food products must be for the treatment of certain inherited diseases of amino acid and organic acid metabolism. We cover modified solid food products up to a maximum of $2,500 per calendar year or any continuous twelve-month period.

The payment of these benefits is subject to all of the terms and conditions of this *plan*.

CGP-3-R-ENT-NY-99                                                    B453.5651-R

**Charges Covered With Special Limitations (Cont.)**

**Reconstructive Surgery Following A Mastectomy**

We pay benefits for *covered charges* for reconstructive surgery following a mastectomy. What we pay is subject to all the terms of this *plan* and to the following limitations.

We cover charges for: (a) breast reconstruction following surgery for a mastectomy; (b) surgery and reconstruction of the other breast to produce a symmetrical appearance; and (c) prostheses and physical complications for all stages of a mastectomy, including lymphedemas.

CGP-3-R-WHCR-98                                                                                  B453.5650-R

**Mental And Nervous Conditions**

We limit what we pay for the treatment of *mental and nervous conditions*. We include a *sickness* under this provision if it manifests symptoms which are primarily mental or nervous regardless of any underlying physical cause.

A *covered person* may be confined in a *hospital* or in a *mental health center* for such treatment. If so, we pay benefits for *covered charges* incurred during that confinement the same way we pay benefits for *sickness*. But we only pay benefit for the first 30 days of confinement in a *benefit year.*

A *covered person* may also receive such treatment as an outpatient. If so, we pay benefits for *covered charges* incurred for such treatment the same way we pay benefits for *sickness.* But we only pay benefits for the first 30 outpatient visits in a *benefit year.* And we limit what we pay for outpatient treatment to $50.00 for each visit.

A *covered person* may also receive such treatment on a crisis intervention basis, if a licensed or certified mental health care provider certifies that a psychiatric emergency situation exists. Crisis intervention services consist of three outpatient psychiatric emergency visits each *benefit year.* We pay benefit for *covered charges* incurred during these three visits the same way we pay benefits for a *sickness.* But we limit what we pay for each visit to $60.00.

As used in this provision, "psychiatric emergency" means a situation in which the *covered person* appears to have a mental or nervous disorder for which immediate observation, care and treatment is necessary to avoid serious harm to the *covered person* or to others.

Outpatient treatment or crisis intervention services can be furnished by any properly licensed or certified *doctor,* psychologist or social worker. Or they can be furnished by a *hospital* or *mental health center.*

We don't pay for *custodial care,* education or training.

CGP-3-R3-MN-NY-98                                                                               B453.5286-R

**Alcohol And Drug Abuse**

We limit what we pay for the care and treatment of alcohol and drug abuse.

A *covered person* may be confined to a *hospital, alcohol abuse center* or to a *drug abuse center* for such treatment. If he is, we pay benefits for the *covered charges* incurred during that confinement the same way we'd pay such charges for any other *sickness.* But, we only pay benefits for the first 60 days of confinement in any *benefit year.* And we don't pay for *custodial care,* education, or training.

## Charges Covered With Special Limitations (Cont.)

We also cover treatment of up to 60 outpatient visits per *benefit year* for the treatment of alcoholism and drug abuse. Of these, 20 visits may be for other family members; even if the *covered person* in need of care and treatment is not receiving it.

Outpatient treatment for alcoholism and drug abuse must be rendered in facilities in New York State which are certified by: (a) the Division of Alcoholism and Alcohol Abuse; and (b) the Division of Drug Abuse Services, respectively; as medically supervised ambulatory drug abuse programs.

CGP-3-R3-37-AD-NY

B453.0640-R

## Exclusions

We don't pay for any charge identified as a *non-covered expense.*

We don't pay for services and supplies for which no charge is made, or for which, in the absence of this insurance, the *covered person* is not required to pay. This usually means services and supplies furnished by: (a) a *covered person's employer,* labor union or similar group, in its medical department or clinic; (b) a *hospital* or clinic owned or run by any government body; or (c) any public program, except *Medicaid,* paid for or sponsored by any government body. But, if a charge is made and we are legally required to pay it, we will.

We don't pay for services and supplies which are not: (a) furnished or ordered by a recognized provider; (b) medically necessary to diagnose or treat a *sickness* or *injury;* (c) accepted by a professional medical society in the United States as beneficial for the control or cure of the *sickness* or *injury* being treated; and (d) furnished within the framework of generally accepted methods of medical management currently used in the United States.

We don't pay for *experimental treatment.*

We don't pay for care and treatment of *sickness* or *injury* caused, directly or indirectly, by declared or undeclared war or act of war. And we don't pay for care and treatment of *sickness* or *injury* which occurs while a *covered person* is on active duty in any armed force.

We don't pay for services or supplies furnished by close relatives. By "close relatives" we mean: (a) your spouse, children, parents, brothers and sisters; and (b) any person who is part of your household. And we don't pay for services or supplies furnished by business or professional associates of you or your family.

CGP-3-R3-38.0

B450.1223-R

We don't pay for care and treatment needed due to: (a) an on-the-job or job-related *injury;* or (b) *sickness* or *injury* for which benefits are payable by Worker's Compensation or similar laws.

CGP-3-R3-40.0

B450.1225-R

**Exclusions (Cont.)**

We don't pay for care and treatment of conditions caused, directly or indirectly, by: (a) a *covered person* taking part in a riot or other civil disorder; or (b) a *covered person* taking part in the commission of a felony.

CGP-3-R3-41.0                                                              B450.1226-R

We don't pay for personal comfort items, like TV's and phones. And we don't pay for items which are generally useful to the patient's household, including but not limited to first aid kits, exercise equipment, air conditioners, humidifiers and saunas.

We don't pay for *custodial care,* education or training. And we don't pay for room and board in a rest home, old age home, or any place which is mainly a school.

We don't pay for eyeglasses, contact lenses or hearing aids. And we don't pay for the prescribing and fitting of such, or for vision and hearing visits.

We don't pay for wigs, toupees, hair transplants, hair weaving or any drug used to restore hair growth.

CGP-3-R3-42.0                                                              B450.1227-R

We don't pay for routine foot care.

CGP-3-R3-43.0                                                              B450.1228-R

Unless this *plan* provides specific benefits, we don't pay for routine preventive care for any *covered person.* Such care includes: (a) routine physical checkups; (b) related X-rays and laboratory tests; and (c) immunizations.

CGP-3-R3-44.0                                                              B450.1230-R

We don't pay for room or board charges for a *covered person* in any facility for any period of time during which he or she was not physically present.

We don't pay for cosmetic surgery, except for reconstructive surgery needed due to a *sickness* or *injury* as explained in the provision "Doctor's Charges for Surgery."

CGP-3-R3-46.0                                                              B450.1232-R

We don't pay for radial keratotomy or other refractive surgery for the purpose of altering, modifying or correcting: (a) myopia; (b) hyperopia; or (c) stigmatic error.

CGP-3-R3-RKE-94                                                            B453.3572-R

We don't pay for ambulance services used to transport a *covered person* from a *hospital* or other health care facility, unless the *covered person* is being transferred to another *inpatient* health care facility.

We don't pay for services and supplies which are specifically limited or excluded in other parts of this *plan*.

CGP-3-R3-53.0                                                              B450.1239-R

### Hospital Bill Audit Bonus

We pay a cash bonus to any covered person who shows us that he was overcharged by $10.00 or more on his hospital bill. But the error must be for a covered charge. To get the bonus, the covered person must obtain a corrected bill and send the corrected bill and the original, incorrect bill to us. The bonus equals the lesser of: (a) 50% of the overcharge; or (b) $500.00.

CGP-3-R-MM-CC-85-9.0                                               B455.0002-R

### Converting This Group Health Insurance

**Important Notice**

This section applies only to hospital, surgical, out-of-network point-of-service and major medical expense coverages. In this section these coverages are referred to as "group health benefits".

This section does not apply to coverages which provide benefits for loss of life, loss of income due to disability, prescription drug expense, or dental expense, if provided under this plan. These coverages cannot be converted under this section.

**If An Employee's Group Health Benefits End**

An employee can obtain a converted policy if his group health benefits end due to the termination of: (a) his employment; (b) his membership in an eligible class of employees; or (c) this group plan, unless it is replaced with similar and continuous coverage.

But, an employee must have been insured by this group plan for at least three consecutive months immediately prior to the date his group health benefits end.

The converted policy will cover the employee, and at his option, those of his dependents whose group health benefits also end.

**If An Employee Dies While Insured**

If an employee dies while insured, after any applicable continuation period has ended, his then insured spouse may convert. The converted policy will cover the spouse and those of the employee's dependent children whose group health benefits end. If the spouse is not living, each dependent child whose group health benefits end may convert for himself.

**If An Employee's Marriage Ends**

If an employee's marriage ends by legal divorce or annulment, his former spouse can convert. The converted policy will cover the former spouse and those of the employee's dependent children whose group health benefits end.

**When A Dependent Loses Eligibility**

When an insured dependent stops being an eligible dependent, as defined in this plan, he may convert. The converted policy will only cover the dependent whose group health benefits end.

**How And When To Convert**

To convert, the applicant must apply to us in writing and pay the required premium. He has 45 days after his group health benefits end to do this. We don't ask for proof of insurability. The converted policy will take effect on the date the applicant's group health benefits end. If the applicant is a minor or incompetent, the person who cares for and supports the applicant may apply for him.

**Converting This Group Health Insurance (Cont.)**

**Notice Of This Conversion Right**    If an employee is entitled to obtain a converted policy, the employer must give him written notice of such right. The employer must give the employee the notice in person, or mail it to his last known address.

This notice should be given within 15 days before or after the employee's group health benefits end. If the notice isn't given at the proper time, the employee will have 45 days from the date the notice is given to apply for the converted policy and pay the required premium. But whether or not the notice is given, the extra time won't extend more than 90 days past the period otherwise allowed for the employee to convert.

**The Converted Policy**    The applicant may convert to one of the individual health insurance policies we normally issue for conversion at the time he applies. The converted policy will comply with the laws of the place the applicant lives when he applies.

The premium for the converted policy will be based on: (a) the plan the applicant selects; (b) the risk and rate class, under the group plan, of the people to be covered; and (c) the ages of the people to be covered, as of the date the policy takes effect.

**Restrictions**    (1) A covered person can't convert if his group health benefits end because the employee has failed to make required payments.

(2) A covered person can't convert if he is eligible for similar benefits elsewhere which, together with the converted policy, would result in overinsurance by our standards. Where required, our overinsurance standards are on file with the state insurance department.

(3) A covered person can't convert if he's eligible for Medicare by reason of age.

**Please Note**    The benefits provided under the converted policy are not identical to the benefits provided under the group plan. The converted policy provides more limited benefits. Ask the employer for details or write to us.

CGP-3-R-CONV-NY-89

B456.0064-R

## COORDINATION OF BENEFITS

| | |
|---|---|
| **Important Notice** | This provision applies to all health expense benefits under this plan. It does not apply to death, dismemberment, or loss of income benefits. |
| **Purpose Of This Provision** | An employee may be covered for health expense benefits by more than one plan. For instance, he may be covered by this plan as an employee and by another plan as a dependent of his spouse. If he is, this provision allows us to coordinate what we pay with what another plan pays. We do this so the covered person doesn't collect more in benefits than he incurs in charges. |
| **Definitions** | "We" and "our" mean The Guardian Life Insurance Company of America. |
| | "Plan" means any of the following that provides health expense benefits or services: (a) group or blanket insurance plans; (b) group Blue Cross plans, group Blue Shield plans, or other service or prepayment plans on a group basis; (c) union welfare plans, employer plans, employee benefits plans, trusteed labor and management plans, or other plans for members of a group; and (d) Medicare or other governmental benefits, including mandatory no-fault auto insurance. |
| | "Plan" does not include Medicaid or any other government program or coverage which we are not allowed to coordinate with by law. Plan also does not include blanket school accident-type coverage. Nor does it include any plan we say we supplement. Plans that we supplement are named in the schedule. |
| | "This plan" means the part of our group plan subject to this provision. |
| | "Member" means the person who receives a certificate or other proof of coverage from a plan that covers him for health expense benefits. |
| | "Dependent" means a person who is covered by a plan for health expense benefits, but not as a member. |
| | "Allowable expense" means any necessary, reasonable, and usual expense for health care incurred by a member or dependent under both this plan and at least one other plan. When a plan provides service instead of cash payment, we view the reasonable cash value of each service as an allowable expense and as a benefit paid. We also view benefits payable by another plan as an allowable expense and as a benefit paid, whether or not a claim is filed under that plan. |
| | The difference between the cost of a private hospital room and the cost of a semi-private hospital room is not considered an allowable expense unless the covered person's stay in a private hospital room is medically necessary in terms of generally accepted medical practice. |
| | "Claim determination period" means a calendar year in which a member or dependent is covered by this plan and at least one other plan and incurs one or more allowable expense under such plans. |
| **How This Provision Works** | We apply this provision when a member or dependent is covered by more than one plan. When this happens we consider each plan separately when coordinating payments. |

**Coordination of Benefits (Cont.)**

In order to apply this provision, one of the plans is called the primary plan. A secondary plan is one which is not a primary plan. The primary plan pays first, ignoring all other plans. If a person is covered by more than one secondary plan, the order of benefit determination rules, which follow, decide the order in which the benefits are determined in relation to each other. The benefits of each secondary plan may take into consideration the benefits of any other plan which, under the rules of this section, has its benefits determined before those of that secondary plan.

If a plan has no coordination provision, it is primary. But, during any claim determination period, when this plan and at least one other plan have coordination provisions, the rules that govern which plan pays first are as follows:

(A) A plan that covers a person as a member pays first; the plan that covers a person as a dependent pays second;

(B) Except for dependent children of separated or divorced parents, the following governs which plan pays first when the person is a dependent of a member:

A plan that covers a dependent of a member whose birthday falls earliest in the calendar year pays first. The plan that covers a dependent of a member whose birthday falls later in the calendar year pays second. The member's year of birth is ignored.

If both parents have the same birthday, the benefits of the plan which covered the parent longer are determined before those of the plan which covered the other parent for a shorter period of time.

But, if the plan that we're coordinating with does not have a similar provision for such persons, then (B) will not apply and the other plan's coordination provision will determine the order of benefits.

(C) For a dependent child of separated or divorced parents, the following governs which plan plays first when the person is a dependent of a member:

CGP-3-R-COB-NY-86                                          B555.0003-R

(1) When a court order makes one parent financially responsible for the health care expenses of the dependent child, then that parent's plan pays first;

(2) If there is no such court order, then the plan of the natural parent with custody pays before the plan of the stepparent with custody; and

(3) The plan of the stepparent with custody pays before the plan of the natural parent without custody.

(D) A plan that covers a person as an active employee or as dependent of such employee pay first. A plan that covers a person as a laid-off or retired employee or as a dependent of such employee pays second.

But, if the plan that we're coordinating with does not have a similar provision for such persons, then (D) will not apply.

If rules (A), (B), (C), and (D) don't determine which plan pays first, the plan that has covered the person for the longer time pays first.

**Coordination of Benefits (Cont.)**

To determine the length of time a covered person has been insured under a plan, two plans will be treated as one if the covered person was eligible under the second within 24 hours after the first plan ended.

The covered person's length of time covered under a plan is measured from his first date of coverage under the plan. If that date is not readily available, the date the covered person first became a member of the group will be used.

If, when we apply this provision, we pay less than we would otherwise pay, we apply only that reduced amount against payment limits of this plan.

**Our Right To Certain Information**

In order to coordinate benefits, we need certain information. An employee must supply us with as much of that information as he can. But if he can't give us all the information we need, we have the right to get this information from any source. And if another insurer needs information to apply its coordination provision, we have the right to give that insurer such information. If we give or get information under this section, we can't be held liable for such action except as required by Article 25 of the New York General Business Law.

When payments that should have been made by this plan have been made by another plan, we have the right to repay that plan. If we do so, we're no longer liable for that amount. And if we pay out more than we should have, we have the right to recover the excess payment.

**Small Claims Waiver**

We don't coordinate payments on claims of less than $50.00. But if, during any claim determination period, more allowable expenses are incurred that raise the claim above $50.00, we'll count the entire amount of the claim when we coordinate.

CGP-3-R-COB-NY-86-2                                                    B555.0004-R

## HOW THIS PLAN INTERACTS WITH MEDICARE

The following provisions explain how this plan's group health benefits interact with the benefits available under Medicare. A covered person may be eligible for Medicare by reason of age, disability, or End Stage Renal Disease. Different rules apply to each type of Medicare eligibility, as shown below.

With respect to the following provisions:

(1) A covered person is considered to be eligible for Medicare by reason of age from the first day of the month during which he reaches age 65. However, if the covered person is born on the first day of a month, he is considered to be eligible for Medicare from the first day of the month which is immediately prior to his 65th birthday.

(2) "Group health benefits" means any hospital, major medical, out-of-network point-of-service, prescription drug and surgical coverages provided by this plan.

(3) A "primary" health plan pays benefits for a covered person's covered charge first, ignoring what the covered person's "secondary" plan pays. A "secondary" health plan then pays the remaining unpaid allowable expenses. See this plan's "Coordination of Benefits" provision for a definition of "allowable expense".

CGP-3-R-MED-89-1                                    B560.0011-R

### Medicare Eligibility By Reason Of Age

**Applicability**    This section applies to an employee or his insured spouse who is eligible for Medicare by reason of age.

Under this section, such an employee or insured spouse is referred to as a "Medicare eligible."

This section does not apply to: (a) a covered person other than an employee or insured spouse; (b) an employee or insured spouse who is under age 65; or (c) a covered person who is eligible for Medicare solely on the basis of End Stage Renal Disease.

**When An Employee Or Insured Spouse Becomes Eligible For Medicare**    When an employee or insured spouse becomes eligible for Medicare by reason of age, if he incurs a covered charge for which benefits are payable under both this plan and Medicare, this plan is considered primary. This plan pays first, ignoring Medicare. Medicare is considered the secondary plan.

CGP-3-R-MED-89-2                                    B560.0014-R

### Medicare Eligibility by Reason of Disability

**Applicability**    This section applies to a covered person who is: (a) under age 65; and (b) eligible for Medicare by reason of disability.

Under this section, such covered person is referred to as a "disabled Medicare eligible."

## Medicare  Eligibility  by  Reason  of  Disability  (Cont.)

This section does not apply to: (a) a covered person who is eligible for Medicare by reason of age; or (b) a covered person who is eligible for Medicare solely on the basis of End Stage Renal Disease.

**When A Covered Person Becomes Eligible For Medicare**

When a covered person becomes eligible for Medicare by reason of disability:

- Medicare is his or her primary health plan, if the disabled Medicare eligible is covered under this plan as an employee; and

- This plan is his or her primary health plan, if the disabled Medicare eligible is covered under this plan as a dependent.

**When Medicare Is Primary**

When Medicare is the primary health plan, this plan supplements the benefits provided by Medicare. If the disabled Medicare eligible incurs a covered charge for which benefits are payable under both this plan and Medicare, we subtract what Medicare pays from what we'd normally pay.

The disabled Medicare eligible must be covered by both Parts A and B of Medicare. If he or she is not, he or she must meet the Medicare Alternate Deductible. The Medicare Alternate Deductible is equal to the Cash Deductible plus what Parts A and B of Medicare would have paid had the covered person been so insured.

**When This Plan Is Primary**

When this plan is the primary health plan, if the disabled Medicare eligible incurs a covered charge for which benefits are payable under both this plan and Medicare, this plan pays first, ignoring Medicare. Medicare is considered the secondary plan.

CGP-3-R-MED-93-5                                                                B560.0043-R

## Medicare  Eligibility  By  Reason  Of  End  Stage  Renal  Disease

**Applicability**

This section applies to a covered person who is eligible for Medicare solely on the basis of End Stage Renal Disease (ESRD).

Under this section, such a covered person is referred to as an "ESRD Medicare eligible."

This section does not apply to a covered person who is eligible for Medicare by reason of age or disability.

**When A Covered Person Becomes Eligible For Medicare Due To ESRD**

When a covered person becomes eligible for Medicare solely on the basis of ESRD, for a period of up to 30 consecutive months, if he incurs a charge for the treatment of ESRD for which benefits are payable under both this plan and Medicare, this plan is considered primary. This plan pays first, ignoring Medicare. Medicare is considered the secondary plan.

This 30 month period begins on the earlier of: (a) the first day of the month during which a regular course of renal dialysis starts; and (b) with respect to a ESRD Medicare eligible who receives a kidney transplant, the first day of the month during which such covered person becomes eligible for Medicare.

## Medicare  Eligibility  By  Reason  Of  End  Stage  Renal  Disease  (Cont.)

After the 30 month period described above ends, if an ESRD Medicare eligible incurs a charge for which benefits are payable under both this plan and Medicare, we supplement what Medicare pays. We subtract what Medicare pays from what we'd normally pay. If a covered person is eligible for Medicare solely on the basis of ESRD, he must be covered by both Parts A and B. If he's not, he must meet the Medicare Alternate Deductible

The Medicare Alternate Deductible is equal to the Cash Deductible plus what Parts A and B of Medicare would have paid had the covered person been so insured.

CGP-3-R-MED-89-8                                                    B560.0039-R

## Other  People  Who  Are  Eligible  For  Medicare

**Applicability**

This section applies to a *covered person* who: (a) is eligible for Medicare; but (b) does not fall into any of the categories discussed above.

Under this section, such *covered persons* are referred to as "other Medicare eligibles."

This section does not apply to any *covered person* who is eligible for Medicare as described in the above sections.

**When Other Covered Persons Become Eligible For Medicare**

When a *covered person* other than one discussed above becomes eligible for Medicare, this *plan* supplements the benefits provided by Medicare.

If an "other Medicare eligible" incurs a *covered charge* for which benefits are payable under both this *plan* and Medicare, we subtract what Medicare pays from what we'd normally pay. But what we pay is based on all of the terms of this *plan*.

An "other Medicare eligible" must be covered by both Parts A and B of Medicare. If he's not, he must meet the Medicare Alternate Deductible. The Medicare Alternate Deductible is equal to the Cash Deductible plus what Parts A and B of Medicare would have paid had the covered person been so insured.

CGP-3-R-MED-89-9                                                    B560.0044-R

## CERTIFICATE  AMENDMENT

This plan is amended so that if a covered person is injured because of a third party's wrongful act or negligence:

- we will pay medical, dental or loss of earnings benefits for the injury, to the extent otherwise covered by this plan, if the covered person: (a) agrees in writing to The Guardian being subrogated to any recovery or right of recovery the covered person has against that third party; (b) does not take any action which would prejudice our subrogation rights; and (c) cooperates in doing what is reasonably necessary to assist us in any recovery;

- we will be subrogated only to the extent of benefits paid by this plan because of that injury; and

- we will be subrogated only when the amounts (or portion) received by the covered person through a third party settlement or satisfied judgment is specifically identified as amounts paid as benefits under this plan.

As used in this rider:

"Subrogation" means our right to recover any benefit payments made under this plan:

- because of an injury to a covered person caused by a third party's wrongful act or negligence; and

- which the covered person later recovers from the third party or the third party's insurer.

"Third Party" means any person or organization other than The Guardian, the employer or the covered person.

Except as stated in this rider, nothing contained in this rider changes or affects any other terms of this certificate.

**The Guardian**  Life Insurance Company of America

*Sanford Herman*

Vice President, Group Pricing & Standards

CGP-3-SUBR-NY-92

B600.0004-R

## REQUIRED  DISCLOSURE  STATEMENT

**For Group Plan No.:** G -00298282-JC

The schedule of insurance on page CGP-3-SI of the certificate booklet is a short summary of the health insurance benefits this plan provides. These benefits, including any exclusions and limitations, are fully explained in other parts of the certificate booklet. READ THE CERTIFICATE BOOKLET WITH CARE.

As evidenced by your certificate booklet, this plan provides the following health insurance benefits:

Major Medical Expense Insurance (defined as Major Medical Insurance by the New York State Insurance Department) -- This insurance meets the minimum standards set by the Insurance Department for Major Medical Insurance.

This plan does not provide Basic Hospital Insurance, Basic Medical Insurance, or Medicare Supplement Insurance, as defined by the New York State Insurance Department.

**Notice**     The above statements are not part of the group policy. The group policy alone determines the rights and duties of: (a) the employer to whom this plan is issued; (b) the policyholder (if other than such employer); (c) the Guardian; and (d) any person covered by this plan.

CGP-3-SUBR-NY-92

## GLOSSARY

This Glossary defines the italicized terms appearing in your booklet.

CGP-3-GLOSS-90                                                    B900.0118-R

**Ambulatory Surgical Center**  means a facility which is mainly engaged in performing outpatient surgery. It must: (a) be staffed by *doctors* and *nurses*, under the supervision of a *doctor*; (b) have permanent operating and recovery rooms; (c) be staffed and equipped to give emergency care; and (d) have written back-up arrangements with a local *hospital* for emergency care. We'll recognize it if it carries out its stated purpose under all relevant state and local laws, and it is either: (a) accredited for its stated purpose by either the *Joint Commission* or the Accreditation Association for Ambulatory Care; or (b) approved for its stated purpose by *Medicare*. We don't recognize a facility as an *ambulatory surgical center* if it is part of a *hospital*.

CGP-3-GLOSS-90                                                    B900.0013-R

**Benefit Year**  with respect to the Major Medical Expense portion of this *plan*, means each successive 12 month period which starts on January 1st and ends on December 31st.

CGP-3-GLOSS-90                                                    B900.0015-R

**Birthing Center**  means a facility which mainly provides care and treatment for people during uncomplicated pregnancy, routine full-term delivery, and the immediate post-partum period. It must: (a) provide full-time skilled nursing care by or under the supervision of *nurses;* (b) be staffed and equipped to give emergency care; and (c) have written back-up arrangements with a local *hospital* for emergency care. We'll recognize it if: (a) it carries out its stated purpose under all relevant state and local laws; or (b) it is approved for its stated purpose by the Accreditation Association for Ambulatory Care; or (c) it is approved for its stated purpose by *Medicare*. We don't recognize a facility as a *birthing center* if it's part of a *hospital*.

CGP-3-GLOSS-90                                                    B900.0016-R

**Co-Insurance**  means the percentage of a covered charge that must be paid by a *covered person* to a provider. Co-insurance does not include deductibles or *non-covered expenses.*

CGP-3-GLOSS-90                                                    B750.0305-R

**Co-Payment**  is a $10.00 charge paid to a *PPO doctor* each time a *covered person* visits his or her office for evaluation and management. We waive any of this *plan's co-insurance* and cash deductibles for any service for which a co-payment is paid. The co-payment is distinct from the cash deductible and is a *non-covered expense.* However, a co-payment is not charged for surgery, radiology, laboratory and other therapeutic services performed in a *doctor's* office. Also, a co-payment is not charged for any visit for the treatment of *mental and nervous conditions,* alcohol abuse or drug abuse. This *plan's co-insurance,* if any, and cash deductibles apply to charges for all of these services.

CGP-3-GLOSS-90                                                    B750.0301-R

| | |
|---|---|
| **Covered Charges** | are reasonable charges for the types of services and supplies described in the "Covered Charges" and "Charges Covered with Special Limitations" sections. The services and supplies must be: (a) furnished or ordered by a recognized health care provider; (b) medically necessary to diagnose or treat a *sickness* or *injury;* (c) accepted by a professional medical society in the United States as beneficial for the control or cure of the *sickness* or *injury* being treated; and (d) furnished within the framework of generally accepted methods of medical management currently used in the United States. |

By "reasonable" we mean the charge isn't more than the usual local charge for that service or supply. When we decide what's reasonable, we look at the *covered person's* condition and how severe it is. And we also look at special circumstances.

A *covered charge* is incurred on the date the service or supply is furnished. Subject to all of the terms of this *plan,* we pay benefits for *covered charges* incurred by a *covered person* while he's insured by this *plan.* Read the entire *plan* to find out what we limit or exclude.

CGP-3-GLOSS-90                                                                                    B900.0019-R

| | |
|---|---|
| **Covered Dependent** | means an *eligible dependent* who is covered by the Major Medical Expense portion of this *plan.* |
| **Covered Family** | means you and those of your *eligible dependents* who are covered by the Major Medical Expense portion of this *plan.* |

CGP-3-GLOSS-90                                                                                    B900.0081-R

| | |
|---|---|
| **Covered Person** | with respect to the Major Medical Expense portion of this *plan,* means you or a *covered dependent.* |

CGP-3-GLOSS-90                                                                                    B750.0003-R

| | |
|---|---|
| **Creditable Coverage** | means coverage of a person under: (a) a group health plan, including COBRA continuation coverage; (b) an individual health policy; (c) Medicare Part A or B; (d) Medicaid; (e) CHAMPUS; (f) Federal Employees Health Benefit Plan; (g) a medical care program of the Indian Health Service or of a tribal organization; (h) a state health benefits risk pool; (i) a public health plan; or (j) a Peace Corps Plan. |

When determining if coverage is *creditable coverage,* we use the guidelines established by all applicable State and/or Federal laws and regulations. We, however, reserve the right to determine if coverage is included or excluded from the definition of *creditable coverage.*

CGP-3-GLOSS-90                                                                                    B750.0505-R

| | |
|---|---|
| **Custodial Care** | means any service or supply, including room and board, which: (a) is furnished mainly to help a person meet his routine daily needs; and (b) can be furnished by someone who has no professional health care training or skills. Even if you or a *covered dependent* are in a *hospital* or other recognized facility, we don't pay for care if it's mainly *custodial.* |

CGP-3-GLOSS-90                                                                                    B900.0022-R

| | |
|---|---|
| **Doctor** | means a medical or dental practitioner we are required by law to recognize who: (a) is properly licensed or certified to provide medical care under the laws of the state where he practices; and (b) provides medical services which are within the scope of his or her license or certificate and are covered by this *plan*. |

CGP-3-GLOSS-90                                                                                        B900.0023-R

| | |
|---|---|
| **Drug Abuse Centers, Alcohol Abuse Centers, Mental Health Centers** | mainly provide treatment for people with drug abuse, alcohol abuse or mental health problems. We'll recognize such a place if it carries out its stated purpose under all relevant state and local laws, and it is either: (a) accredited for its stated purpose by the *Joint Commission;* or (b) approved for its stated purpose by *Medicare*. |

CGP-3-GLOSS-90                                                                                        B900.0025-R

| | |
|---|---|
| **Durable Medical Equipment** | is equipment which: (a) can withstand repeated use; (b) is mainly and customarily used to serve a medical purpose; (c) is generally not useful to a covered person in the absence of a sickness or injury; and (d) is suitable for use in the home. Some examples are wheel chairs, hospital-type beds, and breathing equipment. |

CGP-3-GLOSS-90                                                                                        B750.0499-R

| | |
|---|---|
| **Eligibility Date** | for dependent coverage is the earliest date on which: (a) you have initial dependents; and (b) are eligible for dependent coverage. |

CGP-3-GLOSS-90                                                                                        B900.0003-R

| | |
|---|---|
| **Eligible Dependent** | is defined in the provision entitled "Dependent Coverage." |

CGP-3-GLOSS-90                                                                                        B750.0015-R

| | |
|---|---|
| **Employee** | means a person who works for the *employer* at the *employer's* place of business, and whose income is reported for tax purposes using a W-2 form. |

CGP-3-GLOSS-90                                                                                        B750.0006-R

| | |
|---|---|
| **Employer** | means NATIONAL BASKETBALL ASSOCIATION . |

CGP-3-GLOSS-90                                                                                        B900.0051-R

| | |
|---|---|
| **Enrollment Date** | means: (a) for a newly hired *employee,* the date you are hired by the *employer* for *full-time* service; (b) for a *late enrollee,* the date you sign the enrollment form; or (c) for a *special enrollee,* the date of the event which triggers a *special enrollment period*. |

CGP-3-GLOSS-90                                                                                        B750.0503-R

| | |
|---|---|
| **Enrollment Period** | with respect to dependent coverage, means the 31 day period which starts on the date that you first become eligible for dependent coverage. |

CGP-3-GLOSS-90                                                                                        B900.0004-R

| | |
|---|---|
| **Experimental Treatment** | means treatment: (a) that has not been scientifically proven or fully developed; (b) cannot be supported in medical literature published by a professional medical society in the United States; (c) is not accepted by a professional medical society in the United States as beneficial for the control or cure of *sickness* or *injury* being treated; or (d) is not furnished within the framework of generally accepted methods of medical management currently being used in the United States. |

CGP-3-GLOSS-90                                                                    B900.0026-R

| | |
|---|---|
| **Extended Care Center** | means a facility which mainly provides full-time *inpatient* skilled nursing care for *sick* or *injured* people who don't need to be in a *hospital.* We'll recognize it if it carries out its stated purpose under all relevant state and local laws, and it is either: (a) accredited for its stated purpose by the *Joint Commission;* or (b) approved for its stated purpose by *Medicare.* In some places, an "Extended Care Center" may be called a "Skilled Nursing Center." |

CGP-3-GLOSS-90                                                                    B900.0027-R

| | |
|---|---|
| **Full-time** | means the *employee* regularly works at least the number of hours in the normal work week set by the *employer* (but not less than 30 hours per week), at his *employer's* place of business. |

CGP-3-GLOSS-90                                                                    B750.0229-R

| | |
|---|---|
| **Home Health Agency** | means a provider which mainly provides home health care to *sick* or *injured* people under a home health care program designed to reduce or eliminate *hospital* stays. We will recognize it if: (a) it carries out its stated purpose under all relevant state and local laws; and (b) it is approved for its stated purpose by *Medicare.* |

CGP-3-GLOSS-90                                                                    B900.0028-R

| | |
|---|---|
| **Hospice** | means a facility which mainly provides palliative and supportive care for terminally ill people under a *hospice* care program. We will recognize a *hospice* if it carries out its stated purpose under all relevant state and local laws, and it is either: (a) approved for its stated purpose by *Medicare;* or (b) accredited for its stated purpose by either the *Joint Commission* or the National Hospice Organization. |

CGP-3-GLOSS-90                                                                    B900.0029-R

| | |
|---|---|
| **Hospital** | means a facility which mainly provides *inpatient* care and treatment for *sick* or *injured* people. It may also provide outpatient services. We'll recognize it if it carries out its stated purpose under all relevant state and local laws, and it is either: (a) accredited as a *hospital* by the *Joint Commission;* or (b) approved as a *hospital* by *Medicare.* |

CGP-3-GLOSS-90                                                                    B900.0030-R

| | |
|---|---|
| **Initial Dependents** | means those *eligible dependents* you have at the time you first become eligible for *employee* coverage. If at this time you do not have any *eligible dependents,* but you later acquire them, the first *eligible dependents* you acquire are your *initial dependents.* |

CGP-3-GLOSS-90                                                                    B900.0006-R

| | |
|---|---|
| **Injury** | means all damage to a *covered person's* body due to an accident, and all complications arising from that damage. |

CGP-3-GLOSS-90                                                                B900.0031-R

| | |
|---|---|
| **Inpatient** | means a *covered person* who is physically confined as a registered bed patient in a *hospital* or other recognized health care facility. |

CGP-3-GLOSS-90                                                                B900.0032-R

| | |
|---|---|
| **Joint Commission** | means the *Joint Commission* on the Accreditation of Health Care Facilities. |

CGP-3-GLOSS-90                                                                B900.0033-R

| | |
|---|---|
| **Late Enrollee** | means an *employee* or dependent who fails to enroll in this *plan:* (a) within 30 days of your hire for *full-time* service with the *employer; (b) within 30 days of the date he or she becomes an eligible dependent; or (c) during a special enrollment period,* as defined below. However, if an eligibility waiting period under this *plan* applies to a *covered person,* the *covered person* will be considered a *late enrollee* if he or she fails to enroll within 30 days of the end of the waiting period. |

CGP-3-GLOSS-90                                                                B750.0501-R

| | |
|---|---|
| **Medicaid** | means the health care program for the needy provided by Title XIX of the Social Security Act, as amended from time to time. |

| | |
|---|---|
| **Medicare** | means Parts A and B of the health care program for the aged and disabled provided by the Title XVIII of the Social Security Act, as amended from time to time. |

CGP-3-GLOSS-90                                                                B900.0034-R

| | |
|---|---|
| **Mental and Nervous Condition** | means a *sickness* which manifests symptoms which are primarily mental or nervous, regardless of any underlying physical cause. |

CGP-3-GLOSS-90                                                                B900.0035-R

| | |
|---|---|
| **Newly Acquired Dependent** | means an *eligible dependent* you acquire after you already have coverage in force for *initial dependents.* |

CGP-3-GLOSS-90                                                                B900.0008-R

| | |
|---|---|
| **Non-Covered Expenses** | are expenses which do not meet our definition of "*covered charges,* " or which exceed any of the benefit limits shown in this *plan,* or which are specifically identified as *non-covered expenses* or are otherwise not covered by this *plan.* |

CGP-3-GLOSS-90                                                                B900.0036-R

| | |
|---|---|
| **Nurse** | is a registered *nurse* or licensed practical *nurse,* including a nursing specialist such as a *nurse* mid-wife or a *nurse* anesthetist, who: (a) is properly licensed or certified to provide medical care under the laws of the state where he or she practices; and (b) provides medical services which are within the scope of his or her license or certificate and are covered by this *plan.* |

CGP-3-GLOSS-90                                                                B900.0037-R

| | |
|---|---|
| **Plan** | means the *Guardian* group *plan* purchased by your *employer*, except in the provision entitled "Coordination of Benefits" where "plan" has a special meaning. See that provision for details. |

                  CGP-3-GLOSS-90                                                 B900.0039-R

| | |
|---|---|
| **PPO** | means Private HealthCare Systems, Inc. (PHCS), a preferred provider organization. |

    CGP-3-GLOSS-90     B750.0254-R

| | |
|---|---|
| **Preferred Provider** | means a health care practitioner or facility that: (a) is a member of the PPO; and (b) has a participating agreement in force with us. |

| | |
|---|---|
| **Preferred Provider Organization** | see PPO. |

    CGP-3-GLOSS-90     B750.0749-R

| | |
|---|---|
| **Proof or Proof of Insurability** | means an application for insurance showing that a person is insurable. |

    CGP-3-GLOSS-90     B900.0010-R

| | |
|---|---|
| **Qualified Retiree** | means is a retired employee of the employer who is under age 65 and A) completed at least 10 years of service or B) is at least 54 years old and has completed 20 years of service or more. |

    CGP-3-GLOSS-90     B750.0008-R

| | |
|---|---|
| **Rehabilitation Center** | means a facility which mainly provides therapeutic and restorative services to sick or injured people. We'll recognize it if it carries out its stated purpose under all relevant state and local laws, and it is either: (a) accredited for its stated purpose by either the Joint Commission or the Commission on Accreditation for Rehabilitation Facilities; or (b) approved for its stated purpose by Medicare. In some places a *rehabilitation center* is called a "rehabilitation hospital." |

| | |
|---|---|
| **Residential Treatment Facility** | means a facility which provides 24 hour treatment for people with drug abuse, alcohol abuse or mental health problems on an *inpatient* basis. It must provide at least the following: room and board; medical services; nursing and dietary services; patient diagnosis, assessment and treatment; individual, family and group counseling; and educational and support services. We'll recognize a *residential treatment facility* if it's accredited for its stated purpose by the Joint Commission, and carries out its stated purpose in compliance with all relevant state and local laws. |

    CGP-3-GLOSS-90     B750.0226-R

| | |
|---|---|
| **Routine Foot Care** | means the cutting, debridement, trimming, reduction, removal or other care of corns, calluses, flat feet, fallen arches, weak feet, chronic foot strain, dystrophic nails, excresences, helomas, hyperkeratosis, hypertrophic nails, non-infected ingrown nails, deratomas, keratosis, onychauxis, onychocryptosis, tylomas or symptomatic complaints of the feet. |

    CGP-3-GLOSS-90     B900.0043-R

| | |
|---|---|
| **Routine Nursing Care** | means the nursing care customarily furnished by a recognized facility for the benefit of its *inpatients.* |

    CGP-3-GLOSS-90     B900.0044-R

| | |
|---|---|
| **Sickness** | means any illness or disease suffered by a *covered person.* We consider all complications or recurrences, and all related conditions as one *sickness.* |
| | CGP-3-GLOSS-90                                    B900.0045-R |
| **Special Care Unit** | means a part of a *hospital* set up for very sick patients who must be observed constantly. The unit must have a specially trained staff. And it must have special equipment and supplies on hand at all times. Some types of *special care units* are: (a) intensive care units; (b) cardiac care units; (c) neonatal care units; and (d) burn units. |
| | CGP-3-GLOSS-90                                    B900.0047-R |
| **Special Enrollee** | means an *employee* or dependent who enrolls in this *plan* during a *special enrollment period,* as explained below. |
| **Special Enrollment Period** | means a 30 day period which begins on the later of: (a) the date dependent coverage is made available under this *plan;* and (b) the date an *employee* acquires an *eligible dependent* through marriage, birth, adoption or placement for adoption. An *employee,* and his or her eligible spouse, who previously declined major medical coverage may enroll in this *plan,* at the same time he or she enrolls a new *eligible dependent.* |
| | CGP-3-GLOSS-90                                    B750.0506-R |
| **Spinal Manipulation** | includes manipulation or adjustment of the spine; hot or cold packs; electrical muscle stimulation; diathermy; skeletal adjustments; massage, adjunctive, ultra-sound, doppler, whirlpool or hydro therapy; or other treatment of a similar nature. |
| | CGP-3-GLOSS-90                                    B900.0048-R |

## STATEMENT OF ERISA RIGHTS

As a participant you are entitled to certain rights and protection under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all plan participants shall be entitled to:

(a) examine, without charge, all plan documents, including insurance contracts, collective bargaining agreements and copies of all documents filed by the plan with the U. S. Department of Labor, such as detailed annual reports and plan descriptions. The documents may be examined at the Plan Administrator's office and at other specified locations such as worksites and union halls.

(b) obtain copies of all plan documents and other plan information upon written request to the Plan Administrator, who may make a reasonable charge for the copies; and

(c) receive a summary of the plan's annual financial report from the Plan Administrator (if such a report is required).

In addition to creating rights for plan participants, ERISA imposes duties upon the people, called "fiduciaries", who are responsible for the operation of the employee benefit plan. They have a duty to operate the plan prudently and in the interest of plan participants and beneficiaries. Your employer may not fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA. If your claim for a welfare benefit is denied in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to have your claim reviewed and reconsidered.

Under ERISA, there are steps you can take to enforce the above rights. For instance, you may file suit in a federal court if you request materials from the plan and do not receive them within 30 days. The court may require the plan administrator to provide the materials and pay you up to $110.00 a day until you receive them (unless the materials were not sent because of reasons beyond the administrator's control). If your claim for benefits is denied in whole or in part, or ignored, you may file suit in a state or federal court. If plan fiduciaries misuse the plan's money, or discriminate against you for asserting your rights, you may seek assistance from the U.S. Department of Labor, or file suit in a federal court. If you are successful, the court may order the person you have sued to pay court costs and legal fees. If you lose, the court may order you to pay; for example, if it finds your claim is frivolous. If you have any questions about your plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, you should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory, or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington D.C. 20210.

B800.0050-R

## The Guardian's Responsibilities

B800.0048-R

The medical expense benefits provided by this plan are guaranteed by a policy of insurance issued by The Guardian. The Guardian also supplies administrative services, such as claims services, including the payment of claims, preparation of employee certificates of insurance, and changes to such certificates.

B800.0051-R

The Guardian is located at 7 Hanover Square, New York, New York 10004.

B800.0049-R

## Claims Procedure

Claim forms and instructions for filing claims may be obtained from the Plan Administrator. Completed claim forms and any other required material should be returned to the Plan Administrator for submission to Guardian.

Guardian is the Claims Administrator with respect to processing claims. The Plan Administrator has discretionary authority to determine eligibility for benefits and to construe the terms of the *plan* with respect to claims.

In addition to the basic claim procedure explained in your benefit booklet, Guardian will also observe the procedures listed below. All notification from Guardian will be in writing.

(a)    If a claim is wholly or partially denied, the claimant will be notified of the decision within 90 days after Guardian received the claim.

(b)    If special circumstances require an extension of time for processing the claim, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 90-day period. In no event shall such extension exceed a period of 90 days from the end of such initial period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which Guardian expects to render the final decision.

(c)    If a claim is denied, Guardian will provide to the Plan Administrator, for delivery to the claimant, a notice that will set forth:

    (1)    the specific reason(s) the claim was denied;

    (2)    specific references to the pertinent *plan* provision on which the denial is based;

    (3)    a description of any additional material or information needed to make the claim valid, and an explanation of why the material or information is needed;

    (4)    an explanation of the *plan's* claim review procedure.

A claimant must file a request for review of a denied claim within 60 days after receipt of written notification of denial of a claim.

(d)    Guardian will notify the claimant of its decision within 60 days of receipt of the request for review. If special circumstances require an extension of time for processing, Guardian will render a decision as soon as possible, but no later than 120 days after receiving the request. Guardian will notify the claimant about the extension.

The above procedures are required under the provisions of ERISA.

B800.0069-R

## Termination  of This Group Plan

Your *employer*  may terminate this group *plan*  at any time.

When this *plan*  ends, you may be eligible to continue or convert your coverage. Your rights,  if any, upon termination of the *plan*  are explained in this benefit booklet.

B800.0067-R

## Termination of This Group Plan

Your *employer* may terminate this group *plan* at any time.

When this *plan* ends, you may be eligible to continue your coverage. Your rights, if any, upon termination of the *plan* are explained in this benefit booklet.

B800.0068-R