## IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. | **JAMES W. MAYFIELD,** | ) |
| 2. | **TERRY DURHAM,** | ) |
| 3. | **EDMUND MIDDLETON,** | ) |
| 4. | **MIKE MATHIS,** | ) |
| | | ) |
| | **Plaintiffs,** | ) |
| | | ) |
| | **vs.** | ) **Case No.: CIV-06-571W** |
| | | ) |
| | | ) |
| 5. | **NATIONAL BASKETBALL ASSOCIATION,** ) | |
| | **Et al.,** | ) |
| | **Defendants.** | ) |

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Respectfully Submitted,

s/ Loren Gibson_____
Loren Gibson, OBA 14348
Gibson & Associates, P.L.C.
105 N. Hudson, Ste 312
Oklahoma City, OK 73102
405/270-0900
405/270-0903 (Fax)
Counsel for Plaintiffs

and

David W. Little, OBA # 14407
Law Offices of David W. Little
115 E. California – Bricktown
Miller-Jackson Building, Suite 350
Oklahoma City, OK  73104-2418
telephone:  (405) 236-4200
facsimile:  (405) 236-4205
toll-free: (888) 236-6791
ATTORNEY FOR PLAINTIFFS

1

Dockets.Justia.com

**Table of Contents**

CBA Provisions……………………………………………………    2

Factual History……………………………………………..    5

Argument & Authority………………………………………..    6

Proposition 1:        PLAINTIFF'S HAVE A COLORABLE
                      CLAIM UNDER THE COLLECTIVE
                       BARGAINING AGREEMENTS
                      WHICH  ARE PART OF THE
                      ERISA WELFARE PLAN…………………    6

Proposition 2:        STRAIGHT 301 ACTION UNDER
                      29 USC § 185 IS VIABLE AND
                       NOT PREEMPTED. ………………………    13

Proposition 3:        DEFENDANT'S MOTION FOR
                      TRANSFER TO THE SOUTHERN
                       DISTRICT OF NEW YORK
                      SHOULD BE DENIED……………………    17

Proposition 4:  ADDITIONAL DISCOVERY TIME
                      SHOULD BE GRANTED. ………………    22

Conclusion ……………………………………………………    24

# Table of Authorities

*Alexander v. Anheuser-Busch Co.,*
  990 F.2d 536, 539 (10th Cir. 1993). …………………………… 9

*Angott v. Owens-Illinois Hourly Ret. Plan,*
  780 F. Supp. 298, 304 (W.D. Pa. 1991)……………………… 9

*Anderson v. AT&T Corp.,*
  147 F.3d 467, 473 (6th Cir. 1998)…………………………… 15

*Armistead v. Vernitron Corp.,*
  944 F.2d 1287, 1298 (6th Cir. 1991)                       passim

*Bozetarnik v. Mahland,*
  195 F.3d 77, 81 (2d Cir. 1999)……………………………….. 8

*Bugher v. Feightner,*
  722 F.2d 1356, 1358-60 (7th Cir. 1983),
   cert. denied, 469 U.S. 822 (1984)…………………………… 15

*Chrysler Credit Corp. v. Country Chrysler, Inc.,*
  928 F.2d 1509 (10th Cir. 1991)……………………………… 18

*Crossroads State Bank v. Savage,*
  436 F. Supp. 743 (D. Okla. 1977)………………………….. 18

*DaPonte v. Manfredi Motors Inc.,*
  157 Fed. Appx. 328, 331-332 (2d Cir. 2005)……..………….. 16

*Firestone Tire & Rubber Co. v. Bruch,*
  489 US 101, 117 (1989)…………………………………….. 11

*International Union of Elec., Elec., Salaried,*
 *Mach. & Furniture Workers v. Murata Erie N. Am.,*
  980 F.2d 889, 902-04 (3d Cir. 1992)………………………… 8

*International Union, United Auto., etc. v. Yard-Man, Inc.,*
  716 F.2d 1476, 1479-1480 (6th Cir. 1983)…………………... 14

*John Wiley & Sons v. Livingston,*
376 U.S. 543, 554-55(1964)…………………………………… 14

*Miller v. Coastal Corp.,*
    978 F.2d 622 (10th Cir. 1992)……………………………… 17

*Murphy v. Heppenstall Co.,*
    635 F.2d 233, 237 (3d. Cir. 1980)…………………………… 15

*Orth v. Wis. State Emples. Union Council 24,*
    2007 U.S. Dist. LEXIS 38285, 27-28 (D. Wis. 2007)………. 10

*Pegram v. Herdrich,*
    530 U.S. 211, 223 (2000)………………………………… 7

*Paper, Allied-Industrial, Chem. & Energy Workers Int'l*
 *Union v. Cont'l Carbon Co.,*
428 F.3d 1285, 1292 (10th Cir. 2005)……………………… 22

*Richardson v. Pension Plan of Bethlehem Steel Corp.,*
    112 F.3d 982, 983 (9th Cir. 1997)…………………………… 8

*ROC, Inc. v. Progress Drillers, Inc.,*
    481 F. Supp. 147, 151 (D. Okla. 1979)……………………… 18

*Shea v. Wells Fargo Armored Serv. Corp.,*
    810 F.2d 372 (2d Cir. 1987)……………………………… 9

*Scheidt v. Klein,*
    956 F.2d 963, 966 (10th Cir. 1992)………………………… 19

*Smith v. Evening News Ass'n,*
    371 U.S. 195, 200 (1962)………………………………… 13

*Upholsterers' International Union v. American Pad & Textile Co,*
    428 (6th Cir. 1967)……………………………………….. 14

*Waldron v. Boeing Co.,*
    388 F.3d 591, 593 (8th Cir. 2004)…………………………… 13

*Wheeler v. Hurdman,*
    825 F.2d 257, 259 (10th Cir. 1987)………………………… 22

*Wm A. Smith Contracting Co. v. Travelers Indemnity Co.,*
    467 F.2d 662 (10th Cir. 1972)………………………..…… 18

*Wilson v. Moog Auto., Inc.*,
193 F.3d 1004, 1008 (8th Cir. 1999)…………………………… 10

*Wooddell v. International Bhd. of Elec. Workers, Local 71*,
502 U.S. 93, 101 (1991)…………………………………………… 14

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

This action presents causes of action under ERISA and the National Labor Relations Act (NLRA). In particular, Plaintiffs' seek relief under ERISA 29 USC. § 1132(a)(1)(B) to recover benefits due under a welfare plan, and to determine their rights to future benefits. Plaintiffs' further seek relief under 1132 (a) (3) (a) & (b) to enjoin future violations, and to other appropriate relief. These are commonly known as § 502 claims, based on original sections of the Act. Plaintiffs' further seek relief under 29 USC § 185 as third party beneficiaries based on Defendants' breach of the collective bargaining agreement ("CBA") between the NBA and the National Basketball Referees Association. This is commonly referred to as a "straight § 301" action.

As noted in the Complaint, the Plaintiffs were all employed as referees in the NBA. Complaint, ¶ 10. Based on on-the-job related physical problems each ceased work for the NBA. Plaintiff Mayfield left in March 1998. Plaintiff Middleton left in January 1999. Plaintiffs Mathis and Durham both left in December 2001. Def. Ex. 1, Zellner Affidavit, ¶ 3.

Plaintiffs' complain that they are still eligible and entitled to receive various fringe benefits from the NBA. Complaint, ¶ 12. These include health insurance, dental insurance, life insurance, accidental death and dismemberment insurance, and access to an EAP program. During their employment each was covered by a collective bargaining agreement. The CBA provides for continuation of various insurance benefits at a zero or reduced premium to Plaintiffs. From the

6

date of their separation until May 2004, each of these Plaintiffs, and all former referees leaving on disability, continued to receive the insurance benefits and premium reductions as specified in the CBA. Indeed, the practice of the NBA providing these benefits and premium reductions for disabled referees goes back to at least 1994 and continued without disagreement, notification, or dispute until the November 2003 notices in the present case that the Defendants had unilaterally decided to rescind the benefits and premium discounts.

### CBA Provisions

There are two CBAs at issue. Plaintiffs Mayfield and Middleton left during the 1995-1999 CBA. Plaintiffs Mathis and Durham left under the 1999-2004 CBA.

Ed Middleton was 56 at time of disability and with 28 years of service. Mayfield was 49 at time of disability, with 11 years of service. (Derived from Ex. 3, pp. 1-2)  Under the 1995 CBA, Article VI ("6"), § 5 (Exhibit 1, pp. 28-29) provided that:

> "(a) when a referee with at least 10 years of NBA experience as a referee… voluntarily resigns or retires from employment with the NBA, the NBA will maintain such referee until age 65 on the NBA group major medical insurance plan and such referee will reimburse the NBA for 50% of the annual premium for such plan. The NBA will also maintain, at the referees option, until age 65, such referee in its group term life insurance plan for the life insurance coverage provided for in Section 2 above[ Ex. 1, p. 26], and such referee sill reimburse the NBA for 100% of the amount paid for such life insurance coverage.
>
> (b) Notwithstanding the foregoing, when a when a referee with at least twenty (20) years of NBA experience as a referee… voluntarily

resigns or retires from employment with the NBA beyond the age of 54, the NBA will maintain such referee until age 65 on the NBA group major medical insurance plan (i) for the first five years following his retirement (but in no event beyond age 65) at no cost to the referee, and (ii) for the next five years (but in no event beyond age 65) and such referee will reimburse the NBA 25% of the annual premium for such plan. The NBA will also maintain, such referee in its group term life insurance plan for the life insurance coverage provided in Section 2 above for the first two years following his retirement (but in no event beyond age 65) at no cost to the referee. Thereafter, the NBA will maintain such referee in its group term life insurance plan for $50,000.00 of "basic" term coverage at no cost to the referee (but in no event beyond age 65) and such referee will reimburse the NBA for 50% of the annual premium for such plan. The NBA will also maintain, at the referees option, until age 65, such referee in its group term life insurance plan for the life insurance coverage provided for in Section 2 above[ Ex. 1, p. 26], and such referee sill reimburse the NBA for 100% of the amount paid for such life insurance coverage.

Under these provisions, because  Plaintiff Middleton had more than 20 years of service, he was entitled to 100% NBA paid for major medical health insurance for the first five years after retirement and 75% NBA paid health insurance thereafter, until February 2008 when he reaches age 65 . He was also entitled to a full NBA paid premium $400,000.00 life insurance policy for the first two years after his retirement and $50,000.00 life insurance policy until age 65. Plaintiff Mayfield, having more than 10 years of service, but less than 20, is entitled to 50% NBA paid major medical health insurance until age 65, which is July 2013. He was entitled to be covered under the $400,000.00 term life insurance policy until age 65.

Similarly, the 1999 CBA had virtually identical provisions. Article 6, § 5 (Ex. 2) provided:

> (b)     Notwithstanding the foregoing, when a referee with at least twenty (20) years of service voluntarily resigns or retires form employment with the NBA beyond the age of 54, the NBA will maintain such referee, until age 65, on the NBA group medical plan (i) for the first five years following his retirement (but in no event beyond age 65) at no cost to the referee, and (ii) for the next five years (but in no event beyond age 65) and such referee will reimburse the NBA for 25% of the annual premium for such plan. The NBA will also maintain such referee in its group term life insurance plan for the life insurance coverage provided in Section 2 above for the first two year following retirement (but in no event beyond age 65) at no cost to the referee. Thereafter, the NBA will maintain such referee in its group term life insurance plan for $50,000.00 of "basic" term coverage at no cost to the referee (but in no event beyond age 65). (Ex. 2, pp. 19-20)[1]

Mathis was 59, with 24 years of service, at time of disability. Durham was 56, with 22 years of service at time of disability. (Derived Ex. 3, pp. 3-4) Both left in December 2001. Hence, under the 1999 CBA Plaintiff s Mathis and Durham, who both had more than 20 years of service, they were entitled to 100% NBA paid for major medical health insurance for the first five years after retirement and 75% NBA paid health insurance thereafter, until  age 65 (11/2007 for Mathis and 5/2010 for Durham). They are also entitled to a full NBA paid premium

---

[1] The 1999 CBA, unlike the 1995 CBA, contains a post-negotiation clause that "no benefits or severance shall be paid by the NBA to a referee who has at any time receive disability benefit payments", However, Plaintiffs' evidence and testimony is that this was not presented during bargaining with the NBRA, was not in any NBA proposals, was not discussed with the NBRA, and was slipped in purely when the CBA was being compiled by the NA without the consent, knowledge, or ratification of the NBRA.

$500,000.00[2] life insurance policy for the first two years after their retirement and $50,000.00 life insurance policy until age 65.

### Factual History

From the date of their disability until May 18, 2004, each of the Plaintiffs fully received the insurance benefits provided for by the CBA under which they retired. On May 24, 2004 each of the Plaintiffs was mailed a packet advising them that their life insurance was "terminated effective May 18, 2004." (Ex. 4, p.1; Ex. 5, p.1; Ex. 6, p.1; Ex. 7, p.1) Simultaneously, the Plaintiffs' were for the first time provided COBRA notices for their health insurance because of "end of employment" and that their regular health insurance benefits ended May 18, 2004. (Ex. 4, p.2; Ex. 5, p.2; Ex. 6, p.2; Ex. 7, p.2) On July 12, 2004 Plaintiffs exercised their appeal rights and requested the NBA Plan Administrator to reconsider and reverse the decision. (Ex. 8) Such was principally based on application of the CBAs to their particular factual circumstances. On September 9, 2004, Robert Criqui, NBA Plan Administrator responded denying the request. (Ex. 9) Criqui was arbitrary and capricious in his determination that he did not believe the CBA, and practices interpreting and applying the CBA, were "relevant to [his] interpretation as Plan Administrator of the provision for the applicable benefit plans." (Ex. 9, p. 2, ¶ 4). Criqui was also arbitrary and capricious in his conclusion

---

[2] As reference in Ex. 2, p. 18, the Article 2 life insurance coverage amounts increased to $500,000.00 in the 1999 CBA.

that the CBA contained no cost-free benefits. Id. On October 26, 2004, the

Defendants advised that no further exhaustion was required. (Ex. 10).

**Argument & Authority**

**Proposition 1:**        **PLAINTIFF'S HAVE A COLORABLE CLAIM UNDER THE COLLECTIVE BARGAINING AGREEMENTS WHICH ARE PART OF THE ERISA WELFARE PLAN.**

ERISA § 502(a)(1)(B) provides that "[a] civil action may be brought (1) by

a participant or beneficiary . . . to recover benefits due to him under the terms of

his plan, to enforce his rights under the terms of the plan, or to clarify his rights to

future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  Section

1132 (a)(3)(a) & (b) similarly provides an action to  (A) to enjoin any act or

practice which violates any provision of this subchapter or the terms of the plan, or

(B) to obtain other appropriate equitable relief.

While Defendants vociferously argue the definition of participant or

beneficiary to exclude former employees after 12 months after disability

retirement, they myopically define the "plan" as only the insurance policies

between the providers and Defendants, Def. Ex. 5-6,[3] and the Summary Plan

Description, Def. Ex. 7. An insurance policy is certainly not entitled to the

presumptive completeness and deferential completeness suggested by Defendants.

Rather, the Defendants ignore that the CBA is also part of the plan. This is

particularly true for "welfare plans" as opposed to retirement plans. Unlike

---

[3] See Also, Def. Ex. 1, Zellner Affidavit, ¶ 5 that the medical dental and life insurance "plan" is a "policy of insurance" with The Guardian and the AD&D "plan" is a "policy of insurance" with Chubb Insurance.

retirement plans, welfare plans are frequently not even reduced to a single,

overarching document. Rather they are permitted to include multiple documents.

ERISA defines a welfare plan as:

"(1) The terms "employee welfare benefit plan" and "welfare plan"
mean any plan, fund, or program which was heretofore or is
hereafter established or maintained by an employer… for the
purpose of providing for its participants or their beneficiaries,
through the purchase of insurance or otherwise, (A) medical,
surgical, or hospital care or benefits, or benefits in the event of
sickness, accident, disability, death or unemployment, or vacation
benefits, apprenticeship or other training programs, or day care
centers, scholarship funds, or prepaid legal services…

Curiously missing is the definition of the Plan documents. However, the

Supreme Court has noted that the Plan is merely a ""scheme decided upon in

advance" for the provision of benefits." *Pegram v. Herdrich*, 530 U.S. 211, 223

(2000). Numerous courts have recognized that a collective bargaining agreement,

with its concomitant obligations regarding union consent before unilateral

modification, can and do constitute part of the Plan. Indeed, 29 U.S.C. §

1024(b)(4) requires a plan administrator, upon written request of participant, to

"furnish a copy of the latest updated summary[] plan description, and the latest

annual report, any terminal report, **the bargaining agreement,** trust agreement,

contract, **or other instruments under which the plan is established or**

**operated**")(emphasis added). This clearly indicates the bargaining agreement is

par of the instruments (plural usage) establishing and governing the Plan.

In *Armistead v. Vernitron Corp.,* 944 F.2d 1287, 1298 (6th Cir. 1991), the Court observed:

> "The court below concluded that it did, reasoning that a medical insurance plan established pursuant to a CBA came within the definition of a welfare benefit plan under ERISA… Therefore, the court below concluded, Vernitron's breach of contract of LMRA § 301 also constituted a violation of ERISA.  In general, we find no fault in the court's treatment of this question."

In *International Union of Elec., Elec., Salaried, Mach. & Furniture Workers v. Murata Erie N. Am.*, 980 F.2d 889, 902-04 (3d Cir. 1992) the Court unambiguously explained "the collective bargaining agreement . . . is considered part of the Plan documents under ERISA" in a pension plan case.  Similarly, numerous courts have reached the same conclusion. *Bozetarnik v. Mahland*, 195 F.3d 77, 81 (2d Cir. 1999) (finding it appropriate to "examine the collective bargaining agreement and the pension plan" where, "although the collective bargaining agreement does not specifically incorporate the pension plan by reference, it refers to" the pension fund, and "the parties and the district court all read the collective bargaining agreement and the pension plan together as 'a whole'"); *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 983 (9th Cir. 1997) [**11]  (noting that a "collectively bargained [pension] agreement [is] governed by ERISA") *Shea v. Wells Fargo Armored Serv. Corp.*, 810 F.2d 372 (2d Cir. 1987) (deciding whether sick leave and vacation benefits promised in the CBA were protected by ERISA); *Angott v. Owens-Illinois Hourly Ret. Plan,* 780 F. Supp. 298, 304 (W.D. Pa. 1991) ("consider[ing] the relevant provisions of

the collective bargaining agreements as if they were set forth in 'Plan documents'"

for purposes of ERISA because,  "although there is no clear indication in the Plan

itself that its provisions should be deemed to include relevant sections of collective

bargaining agreements . . ., the Plan does provide that any termination or

amendment would be subject to the terms of any collective bargaining agreement,

[and] the Employee Benefits Committee . . . when it denied the claims of the

plaintiffs . . . interpreted the Plan provisions as if they included the terms . . . of the

collective bargaining agreements").

 The Eighth Circuit cogently explained the symmetry of considering the

CBA as part of the Plan. In *Wilson v. Moog Auto., Inc.*, 193 F.3d 1004, 1008 (8th

Cir. 1999), the issue as a Plan Administrator's refusal to consider a collectively

bargained agreement with the union in calculating pension benefits. The Court

considered the ERISA requirement of 29 USC § 1102(a) (1) that the Plan shall be

established and maintained pursuant to a written instrument." *Wilson* explained:

> The "written instrument" requirement is intended to ensure that
> participants are on notice of the benefits to which they are entitled
> and their own obligations under the plan. See *Curtiss-Wright Corp.
> v. Schoonejongen*, 514 U.S. 73, 83, 131 L. Ed. 2d 94, 115 S. Ct.
> 1223 (1995); *United Paperworkers Int'l Union v. Jefferson Smurfit
> Corp.*, 961 F.2d 1384, 1386 (8th Cir. 1992). In addition, a written
> instrument provides guidelines, that likewise are known to the
> participants, for the plan administrator as he makes coverage
> decisions. As we explain below, these purposes are not thwarted by
> counting the Closing Agreement among the plan documents to be
> consulted in administering the Company's Pension Plan. *Id.* at 1008.

 Perhaps the matter was best stated, in a case remarkably similar to the

present, that "An ERISA "plan" is not an entity or a piece of paper, but a more

14

inchoate group of rights, benefits and procedures (literally, a "plan") set up by an employer to create pension or welfare benefits." *Orth v. Wis. State Emples. Union Council 24*, 2007 U.S. Dist. LEXIS 38285, 27-28 (D. Wis. 2007) (copy attached).

In *Orth*, a retiree was permitted by a collective bargaining agreement between his union and employer to use sick leave amounts accrued as of retirement to pay health insurance premiums. *Id*. at * 2. Once his accrued leave expired, the Defendant required him to make 100% of the contributions. However, the CBA further provided that the payment of premiums for retiree would be "on the same basis as" current employees, which was that the employer paid 90% of the premium. *Id.*

> *Orth* explained that:
>
> The plan may be evidenced by a summary plan description (SPD) and any other documents, such as a CBA, that describe the rights of beneficiaries or such things as how the plan is administered, how premiums are collected, etc. In other words, the fact that the plaintiff's dispute may arise solely from a clause in a collective bargaining agreement does not mean that the dispute does not also implicate the terms of an ERISA plan. In fact, hybrid ERISA / LMRA claims are commonly asserted, even when the dispute is resolved by reference to a CBA rather than merely a plan-specific document. Id at * 27-28. (Emphasis added)

In the present case, Plaintiffs' have, at least, a colorable claim of entitlement to benefits under the CBA. 29 USC § 1002(7) defines "participant" eligible to bring a §502(a) (1) & (3) claim, as "any employee or **former employee** of an employer… **who is** or may become **eligible to receive a benefit of any type** from an employee benefit plan." (Emphasis added). As Defendants correctly note,

in *Firestone Tire & Rubber Co. v. Bruch*, 489 US 101, 117 (1989) requires a showing of a "colorable claim" to benefits. The Tenth Circuit notes this is a "colorable claim that he will prevail in a suit for benefits." *Alexander v. Anheuser-Busch Co.*, 990 F.2d 536, 539 (10th Cir. 1993).

As demonstrated above, when the CBA is properly considered, the language clearly demonstrates and supports Plaintiffs' claims of entitlement to, reimbursement for, and future payment of health and life insurance benefits. Certainly to the extent necessary to make such claims "colorable." Moreover, the CBA undercuts the Defendants reliance on solely the insurance polices and summary plan description.  The 1995 and 1999 CBAs clearly provided that "this agreement shall govern the terms and conditions of employment of all persons employed by the NBA as referees in the United States and Canada." (Ex. 1, p. 2, Article 1, § 4; Ex. 2, p. 2, Article 1, § 4). Similarly, the 1995 CBA provided "this agreement constitutes the entire understanding between the parties, shall govern their entire relationship…. All understandings, conversations and communications, as well as all prior agreements and practices (except as set forth herein) oral or written express or implied between the NBA and NBRA … are merged into and superseded by this agreement." (Ex. 1, p. 56, Article 14; Ex. 2, p. 48, Article 14(a))  There certainly was no hint that the insurance policy was dictating the terms and conditions of employment and the benefits being derived wherefrom. Similarly, there was no reference that the SPD was covering such. Moreover, to

the extent Defendants so claim, such has been "merged into" the CBA, such that the rest of the CBA terms must be considered in light of the SPD terms.

Moreover, the insurance policies and SPD are inconsistent with each other, and on life insurance issues are left blank. In particular, the insurance policy, Def. Ex. 5, provides that health insurance coverage ends "on the date your active full time service ends for any reason, other than disability." (p. 55) But no deadline is specified if service ends because of disability. The SPD claims "if you are continuously disabled after 12 months, your employment with the NBA will be formally terminated."(Which would trigger a COBRA notice obligation). (Def. Ex. 7, p. 62) Hence, is it active employment, or 12 months after active employment?

Similarly, the insurance policy claims that coverage ends "on the date your active full-time service ends for any reason...including disability." (Def. Ex. 5, p. 48. However, the SPD provides that after 12 months of disability that "Your NBA provided for life insurance coverage will end after you've been disabled **for? months.** At this time you may be eligible for a one-year extension of your coverage, provided by the insurance company at no cost to you." (Def. Ex. 7, p. 62) (Emphasis added). Thereafter, employees are eligible to continue to apply for one year extensions of the life insurances if you continue to be disabled. (Id. pp. 62-63). Hence, under the SPD the life insurance would remain for as long as the disability remained.

The result is that Plaintiffs certainly have a colorable claim for benefits under § 502(a) (1) (B), and § 502(a) (3).

**Proposition 2:** **Straight 301 Action under 29 USC § 185 are viable and not preempted.**

Plaintiff pleads a third party breach of contract action. Complaint, ¶ 17. The contract is the collective bargaining agreements under which each Plaintiff began his disability, which are described above. The CBA provides for the provision of health and life insurance as described, above. [4] 29 U.S.C. § 185(a) provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

"An individual employee alleging breach of a CBA may file a lawsuit against his employer under § 301." *Waldron v. Boeing Co.*, 388 F.3d 591, 593 (8th Cir. 2004) (citing *Smith v. Evening News Ass'n*, 371 U.S. 195, 200 (1962). "Congress expressly provided in § 301(a) for federal jurisdiction over contracts between an employer and a labor organization or between labor organizations. Collective-bargaining agreements are the principal form of contract between an employer and a labor organization. Individual union members, who are often the

---

[4] Plaintiffs' further contend that their terminations of employment were without just cause and therefore they are entitled to remedy under Article 9, § 5(d) (Ex. 1, p. 43; Ex. 2, p 36) and Article 9, § 7 (Ex. 1, p. 45; Ex. 2, p. 38). However, these claims are subject to the NBRA's request to arbitrate, as previously described to the Court in the motions to enlarge the time to respond to this motion.

beneficiaries of provisions of collective-bargaining agreements, may bring suit on these contracts under § 301." *Wooddell v. International Bhd. of Elec. Workers, Local 71*, 502 U.S. 93, 101 (1991) this can particularly apply to cases, like the present, where benefits are earned and accrued in one CBA but not paid until later. *John Wiley & Sons v. Livingston,* 376 U.S. 543, 554-55(1964) ("We see no reason why parties could not if they so chose agree to the accrual of rights during the term of an agreement and their realization after the agreement had expired."). **"The parties may, for example, provide retiree insurance benefits which survive the expiration of the collective bargaining agreement."** *International Union, United Auto., etc. v. Yard-Man, Inc*., 716 F.2d 1476, 1479-1480 (6th Cir. 1983) (citing, 372 F.2d 427 *Upholsterers' International Union v. American Pad & Textile Co*, 428 (6th Cir. 1967); *International Union, UAW, Local 784 v. Cadillac Malleable Iron Co., Inc*., No. G82-75-CA1 (W.D. Mich. April 20, 1982); *American Standard, Inc*. 57 Lab. Arb. (BNA) 698 (1971) (Warns, Arb.); *Roxbury Carpet Co. and Textile Workers of America, AFL-CIO*, 73-2 Lab. Arb. Awards (CCH) para. 8521 (1973) (Summers, Arb.).

The Court will apply standard contractual interpretation standards in examining the CBA, so long as it is consistent with traditional labor principles. *John Wiley*, 376 U.S. at 548. "**The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion**." *Yard-Man*, 716 F.2d at 1479. Such includes the past practice of always paying the full benefits for employees off on disability, in effect at the

time the CBAs were negotiated. "Thus, when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Armistead v. Vernitron Corp.,* 944 F.2d 1287, 1294 (6th Cir. 1991) These claims can be enforced as a third party beneficiary breach of contract. *Anderson v. AT&T Corp.*, 147 F.3d 467, 473 (6th Cir. 1998)

Moreover, ERISA does not preempt the § 301 claim. 29 USC § 1144(d) provides "Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair,   or supersede any law of the United States . . . or any rule or regulation issued under any such law." Court have repeatedly held that § 502 of ERISA was designed to supplement rather than supersede the rights existing under § 301 of the LMRA. See, *Bugher v. Feightner*, 722 F.2d 1356, 1358-60 (7th Cir. 1983), cert. denied, 469 U.S. 822 (1984); *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 659 n. 11 (6th Cir. 1996); *Murphy v. Heppenstall Co.*, 635 F.2d 233, 237 (3d. Cir. 1980). If the Court were to apply provisions of ERISA only, then it would be effectively, and impermissibly, preempting § 301. *Aloisi v Lockheed Martin Energy Sys.* 321 F.3d 551 (6th Cir. 2003). Plaintiffs' § 301 claims for third party breach of the CBA are not preempted by ERISA. Moreover, should the Court conclude Plaintiffs are not participants under ERISA then; ERISA does not apply and does not affect their contract claim. *DaPonte v. Manfredi Motors Inc.*, 157 Fed. Appx. 328, 331-332 (2d Cir. 2005)

The Complaint also pled an equitable estoppel claim. Complaint, ¶ 16. While the Tenth Circuit has rejected equitable estoppel argument to ERISA pension plans, it has not expressly done so to ERISA welfare plans. In particular, *Miller v. Coastal Corp.,* 978 F.2d 622 (10th Cir. 1992)[5], relied upon by Defendants, is a pension plan case.

*Armistead v. Vernitron Corp.,* 944 F.2d 1287, 1329 (6th Cir. 1991), expressly addressed the policy and statutory differences between an equitable estoppel claim for welfare benefits and pension benefits. Armistead defined "Equitable estoppel… precludes a party from exercising contractual rights because of his own inequitable conduct toward the party asserting the estoppel, rather than modifying the contract." Id. The Court considered the primary objection to equitable estoppel that the written plan must be enforced as it, or it is not the written plan. *Armistead* concluded "This reasoning applies primarily to cases involving pension plans and is much less cogent when welfare benefit plans are at issue. The reason is that pension benefits are typically paid out of funds to which both employers and employee contribute." *Id.* at 1300.  *Armistead* concluded:

> This is not necessarily the case with insurance benefit plans. Typically the employer pays policy premiums out of its own assets, perhaps with a contribution from the employee. The actuarial soundness of a fund, which might be depleted if strict vesting and accrual requirements were not observed, is not an issue where a plan of this description is involved. We conclude therefore that in such a case, the purpose of Congress in enacting 29 U.S.C. § 1102(a) would not be frustrated by recourse to estoppel principles, which are

---

[5] Plaintiffs would note that other circuits do permit equitable estoppel claims even in pension plan cases and they therefore preserve their claims in the event the Tenth Circuit reverses itself or the Supreme Court rules.

generally applicable to all legal actions. *Id.* at 1300.

**Proposition 3:**     **DEFENDANT'S MOTION FOR TRANSFER TO THE SOUTHERN DISTRICT OF NEW YORK SHOULD BE DENIED.**

This Court should deny Defendant's motion to transfer this action to the United States District Court for the Southern District of New York because Defendants have failed to show this forum would be so inconvenient as to merit a transfer to the Southern District of New York. Defendants' brief contains only vague assertions of minor inconvenience**.**  Transfer of this action will merely shift the burden of inconvenience from one party to the other. Because Defendants have failed to provide strong evidence that public and private factors favor a transfer of this action, the motion should therefore be denied.

The transfer of pending civil cases from one district to another is governed by 28 U.S.C. § 1404(a), which provides:

> "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

A transfer under 28 U.S.C. § 1404(a) lies within the discretion of the trial court. *Wm A. Smith Contracting Co. v. Travelers Indemnity Co.,* 467 F.2d 662 (10th Cir. 1972).  The burden of establishing that this suit should be transferred is on the movants, and unless the evidence and circumstances of the case are <u>strongly</u> in favor of the transfer, the Plaintiffs' choice of forum should rarely be disturbed.

*Wm. A. Smith Contracting,* at 662. In order to determine whether an action should be transferred a court must consider:

> "the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and, all other considerations of a practical nature that make a trial easy, expeditious and economical."

*Chrysler Credit Corp. v. Country Chrysler, Inc.,* 928 F.2d 1509 (10th Cir. 1991).

The first factor that the Court must consider under § 1404(a) is the convenience of the parties. *ROC, Inc. v. Progress Drillers, Inc.,* 481 F. Supp. 147, 151 (D. Okla. 1979). Significant weight is given to a plaintiff's choice of forum and the deference given this choice will rarely be disturbed. Id. at 151. Where the transfer would merely shift the inconvenience from one party to the other, a motion for transfer should be denied. *Crossroads State Bank v. Savage*, 436 F. Supp. 743 (D. Okla. 1977).

Defendant does not argue that Oklahoma would be an inconvenient forum. Defendant instead argues that the deference usually given a plaintiff's choice of forum is either greatly reduced or nonexistent because only one Plaintiff lives in the forum state. This argument is simply insufficient to show cause for a transfer of venue. Further, the fact that no two Plaintiffs reside in the same state should not

diminish the deference given to these Plaintiffs' choice of forum under these circumstances. No forum is home to more than one Plaintiff, and Defendant's choice is home to none. All four Plaintiffs have agreed to this forum, not just one. Courts have consistently held that a transfer that merely shifts the inconvenience from one party to another will be denied. *Scheidt v. Klein*, 956 F.2d 963, 966 (10th Cir. 1992).

The second factor a court should consider under § 1404(a) is the convenience of the witnesses. In order to make the requisite showing of a witness's inconvenience, a defendant must show that any such witnesses would be unwilling to come to trial in the forum; that deposition testimony would be unsatisfactory; or that the use of compulsory process will be necessary. *ROC, Inc.*, at 152. In the absence of a showing by a defendant that a trial in the present forum would greatly inconvenience the witnesses, this court has declined to grant a motion to transfer. *Crossroads State Bank v. Savage*, 436 F. Supp. 743 (D. Okla. 1977). An assertion of a witness' inconvenience unsupported by facts is deficient to meet the burden required for a motion to transfer. *Scheidt* at 966.

Defendant's brief mentions only one witness, Mr. Robert Criqui. Mr. Criqui has been a long time employee of the NBA, which parenthetically is in the business of travel. These employees travel on a routine basis. This court can certainly take judicial notice of the fact that Commissioner Stern routinely appears on television at venues in every NBA city, including Oklahoma City. This brief fails to include the requisite factual showing this Court has consistently required.

24

Defendant does not claim Mr. Criqui is unwilling to come to trial in Oklahoma. Defendant has also failed to show why deposition testimony would be unsuitable in this case. In short, this Court has required more than a conclusory statement of inconvenience, and Defendant has not provided this Court with any factual basis on which it could rule in their favor.

Defendant also fails to allege any reason this witness will suffer more than a minor inconvenience. Defendants successfully relocated an entire NBA franchise to Oklahoma City, but now claim that because Mr. Criqui lives and works in New York, it will be inconvenient for Mr. Criqui to testify at a trial in Oklahoma. Although not necessarily lavish, Oklahoma City does boast a fully functional airport with daily nonstop service to and from New York City. Further, this witness is not the kind of witness usually considered in a motion for transfer. Mr. Criqui is not a disinterested witness to an automobile accident. He is an employee under the direction and control of Defendant, and directly responsible for the decisions that led to this lawsuit. Any inconvenience he may suffer should be given less deference because he is more similar to a party than to the type of witness 1404(a) seeks to protect.

Among the remaining relevant factors is the relative ease of access to sources of proof, and again a defendant is required to make some showing that a source would be inconvenient in the given forum. *Scheidt,* at 966. Here, Defendant points out that many relevant documents are located in New York. In the *Scheidt*

case, this court refused to grant a motion for transfer, noting specifically that the defendant had not shown any reason why the relevant documents could not be identified and shipped at a relatively minor cost. *Scheidt* at 966. This is exactly the case at bar.

A plaintiff's choice of forum is given heavy deference and should not be disturbed without a strong showing of inconvenience by a defendant. A defendant is required to present a factual basis of this inconvenience. Defendant in this case has not made the requisite showing. The fact that no two Plaintiffs reside in the same forum should have little or no impact on the deference give to these Plaintiffs' choice of forum. More importantly, Defendant makes no real argument that this forum is more than a minor inconvenience. For the aforementioned reasons, Defendant's motion to transfer should be denied.

**Proposition 4: ADDITIONAL DISCOVERY TIME SHOULD BE GRANTED.**

FRCP Rule 56(f) provides that a Rule 56 motion should not be considered until an opportunity for discovery to be had. Here the Defendants have filed this motion without any discovery, of any type, having been conducted. The Defendants claim that theirs is a Rule 12(b)(1),  which permits the addition of materials beyond the Complaint without converting it to a Rule 56 summary judgment. However, a labeling it a 12(b)(1) does not make it so.

In *Paper, Allied-Industrial, Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005), the Court explained:

> However, "a court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case." *Holt*, 46 F.3d at 1003. "The underlying issue [in determining whether the jurisdictional question is intertwined with the merits] is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim." *Pringle v. United States*, 208 F.3d 1220, 1223 (10th Cir. 2000).

However, "When subject matter jurisdiction is dependent upon the same statute which provides the substantive claim in the case, the jurisdictional claim and the merits are considered to be intertwined." *Wheeler v. Hurdman,* 825 F.2d 257, 259 (10th Cir. 1987). This is precisely what is presently occurring the basis for the Defendants motion, ERISA is precisely the same statute involved in both the jurisdictional and substantive claims.

In the present case, Plaintiffs have not had the opportunity to conduct any discovery. There has not been a discovery conference, so that under the Local Rules, discovery request would not yet have to even be answered by Defendants. Plaintiffs have not had the opportunity to explore fully the negotiation history and practices of the CBA related to disability leave and benefits provided. The Defendants claim this was an "administrative oversight" in paying the Plaintiffs. (Zellner Affidavit, ¶ 7). Documents are referred related to such, which should be explored. (Id). Moreover, Plaintiffs understand others left on disability in 1994 and continued to receive their insurance benefits under the CBA terms  until reaching

age 65. If so, this was some administration, neglecting its payout of ERISA funds, with a fiduciary responsibility to properly administer such, for over a decade.

Moreover, Plaintiffs have not had access to all the parties bargaining proposals and negotiations notes, which would provide extrinsic evidence to clarify and understand the ambiguities in the insurance policies, SPD, and the CBA, described above. Indeed, the parties statements at the negotiating table are key indicators of their negotiated intent, particularly when combined with the parties past practices.

The evidence to be sought is in the exclusive control of Defendants (e.g. located at its NY offices, Zellner Affidavit, ¶ 7), and in its files as related to bargaining proposals, negotiation notes, and past practice examples of paying the benefits.

Should the Court determine the above response does not yet permit an adequate exploration of the issues, Plaintiffs request a discovery period of 90 days to permit interrogatories, document request and depositions be taken before a ruling on this matter be made.

**Conclusion**

Based on the above, this Court should deny the motion to dismiss as a colorable claim has been stated, or alternatively permit additional discovery; should find the § 301 claim valid, independent of the ERISA claims; and deny the motion to transfer. Plaintiffs' also hereby move under FRCP Rule 15(a) for leave

to amend the Complaint to conform to the above should the Court find the

Complaint insufficient.

Respectfully Submitted,

s/ Loren Gibson_____
Loren Gibson, OBA 14348
Gibson & Associates, P.L.C.
105 N. Hudson, Ste 312
Oklahoma City, OK 73102
405/270-0900
405/270-0903 (Fax)
Counsel for Plaintiffs

and

David W. Little, OBA # 14407
Law Offices of David W. Little
115 E. California – Bricktown
Miller-Jackson Building, Suite 350
Oklahoma City, OK  73104-2418
telephone:  (405) 236-4200
facsimile:  (405) 236-4205
toll-free: (888) 236-6791
ATTORNEY FOR PLAINTIFFS

## **Certificate of Service**

I, Loren Gibson, hereby certify that the above was served this July 13, 2007
to the following ECF registrants, via the Court's ECF System, in the above
entitled cause:

Howard Ganz
Daniel Halem
Deidre Grossman
Proskauer Rose
1585 Broadway
New York, NY 10036


Graydon Dean Luthey, Jr.
Stephanie Horton
Hall Estill-Tulsa
320 S. Boston, Ste 400
Tulsa, OK 74103

Counsel for NBA, New Orleans/ Oklahoma City Hornets,
NBA Properties Inc, NBA Entertainment Inc,
NBA Media Ventures LLC

/s Loren Gibson